In re JUG END IN THE
BERKSHIRES, INC.,
Debtor.

FIRST AGRICULTURAL
BANK, Plaintiff,

v.

JUG END IN THE BERKSHIRES,
INC., Defendant.

Bankruptcy No. 4–83–00520–G.

United States Bankruptcy Court,
D. Massachusetts.

March 5, 1985.

---

Irving Labovitz, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, Mass., for First Agr. Bank.

Gordon Schultz, Hochberg & Schultz, Boston, Mass., for Jug End of the Berkshires, Inc.

Harvey L. Backmender, Holyoke, Mass., for Small Business Admin.

## MEMORANDUM AND ORDER ON MOTION TO MODIFY STAY TO FORECLOSE UPON COLLATERAL

PAUL W. GLENNON, Bankruptcy Judge.

The movant, the First Agricultural Bank ("Bank"), seeks an order from this Court terminating the automatic stay of 11 U.S.C. § 362, so that it can foreclose upon the real estate and personal property which secures the various obligations owed to it by Debtor Jug End in the Berkshires, Inc. ("Jug End").

### FACTS

1. Debtor Jug End filed a Chapter 11 petition on August 19, 1983. The Bank, holder of both a first and second mortgage on Jug End real estate, filed a Motion to Modify Stay on August 22, 1983 which was amended by motion as allowed by this Court on October 12, 1983.

2. Trial upon the Motion to Modify Stay was commenced in this Court on September 12, 1983 with hearings thereafter taking place on September 22, 1983; October 12, 1983; October 28, 1983; December 14, 1983; January 27, 1984; February 3, 1984; February 10, 1984; May 9, 1984; June 5, 1984; and July 18, 1984.

3. Jug End, located in the southwest Massachusetts town of Egremont, is a resort encompassing approximately 1050 acres, 250 acres of which comprise the resort complex and 800 acres of which constitute "excess land." The complex dates back to the early 1900's and contains an 18 hole golf course and 21 buildings. There is a heated swimming pool, two outdoor tennis courts, horseback riding, badminton and shuffleboard, as well as cross country skiing and ice skating in the winter. Jug End is only a few miles from two of the area's major skiing facilities, Catamount and Butternut.

4. The prior owner of Jug End executed a promissory note and mortgage to the Bank in January, 1973 in the amount of $1,135,000.00 on certain real estate of the Debtor.[1] In June, 1973, the same individual obtained a $66,326.02 loan from the Bank secured by the telephone system that was installed at Jug End.

5. In February 1976, the same owner borrowed another $100,000.00 from the Bank and executed a second mortgage se-

---

1. Monthly payments on the first mortgage were set at $9,850.00 to commence on October 1, 1973 and continue for 20 years.

cured by the same real estate that secured the first mortgage.[2] The validity of both the first and second mortgages held by the Bank, as well as its security interest, have been admitted by the Debtor and are not issues in this case.[3]

6. The prior owner also obtained a Small Business Administration ("SBA") second mortgage for $140,000.00, none of the proceeds of which were used for capital improvements at Jug End.

7. The new and current owners of Jug End, Joe and Kendra Bruno, obtained an $8,183.52 loan from the Bank in November, 1976, secured by a 1977 Jeep motor vehicle.

8. When the Brunos took over the operation of the Debtor's premises in 1977, the focus of Jug End's clientele turned from individual guests to corporate groups and conferences. Jug End's business, in general, is seasonal because of its nature, with the vast majority of revenue coming in the hot summer months and in the fall.

9. The tennis courts and swimming pool had been enclosed by bubbles to enable their use during the colder weather. But since the expense of the bubbles, incurred mostly during the non-busy winter months, exceeded their value and revenue productions, the Brunos did not continue their use after they were damaged in 1980 and 1979, respectively.

10. The proximity of two substantial ski resorts,[4] within 5 to 10 miles of Jug End, made use of the small ski lift at Jug End obsolete and not worth the substantial expense it entailed.

11. When the Brunos took over in September, 1976, the balance due on the first mortgage was $1,050,000.00 and the resort was in substantial need of improvement and repair. During the following years, the Brunos (1) converted the steam boiler heating system to separate hot water zone heating; (2) installed new wiring, fixtures,

and electrical accessories in the main lobby area; (3) purchased new piece goods for the first class rooms; (4) installed new vanities, carpeting, drapes, bedspreads, furniture, and ceilings and walks in Major's House; (5) repaired roofs and foundations; (6) purchased new carpeting, lighting fixtures, mirrors, linens and tablecloths for the dining room; (7) purchased new ranges, ovens, an electrical system, and a refrigeration system for the kitchen; and (8) converted 10 marginal rooms into a fully equipped conference room with separate zone heating.

12. In the fall of 1982, Kendra Bruno fell ill and remained ill through June, 1983. As a result of Kendra's absence from the Jug End operations and Joe Bruno's not "minding the store" during Kendra's illness, sales fell off drastically, making 1983 a poor business year.

13. When Kendra's health improved, the Brunos filed this Chapter 11. They allege that the pendency of the motion to lift the stay has hurt sales, especially with groups that make plans several months, or years ahead of time.

14. The secured loans due to the Bank have at all material times remained in arrears. During 1981 and 1982, the Debtor's year-end statements of income and expenses reflected operating losses of approximately $70,000.00 and $30,000.00 respectively. The 1983 business activity was even worse than that of 1981, or 1982 and the Debtor specifically characterized the 1983 business as a "disaster." Even exclusive of depreciation, the Debtor estimated negative cash flow losses to be in the neighborhood of $100,000 for 1983.

15. On the last day of trial, July 18, 1984, a Bank officer testified that the first mortgage principal and interest, exclusive of attorney's fees, was in the amount of $1,079,924.73. Concerning the second

---

2. Payments on the second mortgage were set at $833.33 per month.

3. There exists no dispute between the parties as to the legal efficacy of the mortgage and secured interest. The only dispute which has

arisen concerns the possible disparity of approximately $100,000.00 between what the Bank says is due and what the Debtor says is due.

4. Catamount is about four miles and Butternut about six miles from Jug End.

mortgage, the Bank officer testified that principal and interest due as of that day was $85,577.01. And, finally, the Bank officer testified that the balance of the secured loan was $16,124.82. All testimony given by the Bank officer was in accordance with the Bank's official records, of which the officer was custodian.

16. The Debtor's principal officer, Joe Bruno, testified that the principal balance on the first mortgage would have been $822,330.58 had all payments been made in a timely fashion. However, the evidence was uncontradicted that the loan had been in chronic arrears for years, as reflected by multiple accommodations by the Bank to allow successive, negotiated indulgences. In May of 1982, the Bank had begun to apply all subsequent monthly payments to long accrued interest, thereby staying any further reduction of principal from that point forward, as would otherwise have been the case had all payments always been timely made. The transcript does not disclose any suggestion by the Debtor that the Bank did not have the legal right to apply the payments against the accrued interest. Nor does the transcript provide any evidence controverting the amount of the obligations claimed by the Bank. The transcript further lacks evidence disputing the validity or lawful nature of any payments made by the Bank to third parties from monies received from the Debtor.

17. In addition to the obligation due to the Bank, the balance due on the SBA loan, upon which no interest has been paid for approximately seven years, was approximated on June 5, 1985 to be about $190,000.00.

18. The Debtor's Schedule A–2 admitted the existence of additional junior mortgages in claimed, although contested, amounts of $240,000.00 and $50,000.00.

19. The evidence further revealed recorded federal tax liens approximating $995,290.00 and claimed Massachusetts state tax liens of $456,602.00.

20. In 1983, unpaid real estate taxes for that year totalled $35,544.55. With the admission by the Debtor as to no payments of any real estate taxes in 1984, it may be reasonably assumed that the unpaid taxes have doubled and have accrued interest.

21. Finally, recorded attachments and other liens on the property of the Debtor, recorded beyond ninety days prior to the filing of the petition, approximate $795,051.24.

22. The evidence is undisputed that the Bank has not received any payments from the Debtor since December of 1982 for real estate taxes, or of either principal or interest on its first mortgage, second mortgage, or secured small loan.

23. At an early stage of the hearings, the debtor admitted that it was barely able to make payroll and pay its other ongoing cash requirements, exclusive of mortgage debt service and taxes, while operating under the protection of the Chapter 11 proceeding. The resort had been closed as a matter of economic necessity during the winter of 1982, and is no longer a "four season" resort due to the lack of success in getting winter packages.

24. The original buildings composing the Debtor's complex were first erected in 1919. The view taken by this Court of the Debtor's property and evidence adduced at trial reflected significant and continuing depreciation in, and to, the collateral secured to the Bank.

25. The Debtor has lost its outdoor covered tennis bubble, its tennis court lights, the use of its trout pool during a major part of the 1983 season, and its snowmobile and ski tow capabilities. The Debtor's golf course is in need of repairs and a number of the buildings previously used as part of the resort facility and part of the main building have been closed. Of 144–155 guest rooms which had been usable in 1978, only between 68 and 80 serviceable guest rooms remained at the time of trial.

26. Early in the trial, Joe Bruno predicted that the Debtor would have to produce gross sales in 1984 of $1,100,000.00 in order to satisfy debt service both to the Bank and to the SBA. Yet, the bi-weekly cash flow statements filed with the United

States Trustee since the filing of the Chapter 11 petition reflect a sales achievement of only a fraction of that required by Bruno's projection.

27. On the final day of testimony, Joe Bruno was somewhat inconsistent in his prediction for 1984. He stated that "Jug End in 1984 was doing fine" and that it would experience a $100,000.00 net profit for the year before debt service to the Bank and taxes. Within a few minutes thereafter, Bruno reduced his expectation of net profit to $75,000.00 and stood by that prediction despite his admission of a 1983 occupancy rate of only 14%. It was then calculated, in Court, that the amount required in 1984 to satisfy Jug End's obligations to the Bank and to pay taxes, without reference to any other mortgages, liens, or secured creditors, was $158,500.00, more than double the total amount of available cash predicted by Bruno for the Debtor in 1984.

28. With gross sales for the first half of 1984 at only about $266,000.00 there is not even the potential for the realization of even a fraction of the total necessary gross achievement to "break even" in 1984.

29. As the Debtor is totally incapable of producing an income stream from operations in amounts sufficient to make even partial payments to the Bank and to taxing authorities, Bruno admitted that an infusion of venture capital would be necessary to rehabilitate the Debtor. Bruno had attempted to sell the property, or find equity holders, since his wife's illness in 1982 but was unable to provide the Court with either purchase and sales agreements, deposits or the names of presently interested buyers or investors.

30. A plan or direction for rehabilitation has yet to be presented by the Debtor.

31. Numerous appraisals of the Debtor's property were completed under the "return on investment" or "income" approach by John Connor ("Connor"), appraiser for the Bank, and Ralph Steinhardt ("Steinhardt"), appraiser for the Debtor. The testimony of these two individuals presented great variance as to the value of the Jug End property.

32. Steinhardt made an initial appraisal for the Debtor in 1976 at $3,200,000.00. Connor valued the same property in 1978 at $2,300,000.00, based largely upon the proforma cash flow projections provided by Steinhardt's 1976 appraisal. In 1983, Connor made another appraisal for the Bank for this trial. His reduction in value of the assets to $1,100,000.00 was based upon the Debtor's actual sales achievement through 1981. Connor explained that in light of the worsening cash flow figures adduced at trial, the "return on investment" value approach would require an even further lowering of value of the Debtor's property to $965,000.00. In 1983, Connor utilized the same general approach that he had in his previous 1978 appraisal. Although there were other changes, the biggest change causing the reduction in value was the significantly reduced gross income actually experienced by the Debtor which was in contrast to that originally projected by Steinhardt in 1976.

33. The capitalization rate ("cap rate") used by Connor in his appraisal was the subject of some inquiry. The Debtor had suggested a 13.7% cap rate as being more realistic than the 16% cap rate used by Connor, but Connor testified that, in his opinion, a 16% cap rate was applicable under local circumstances and conditions. Even with a 13.7% cap rate, Connor stated that the property would still only be worth $1,288,000.00 based on 1981 cash flow figures and only $1,100,000.00 based on the Debtor's 1982 cash flow figures.

34. In contrast to Connor's 1983 appraisal, Steinhardt's 1983 appraisal was not based on the present experience of the debtor nor on the historical experience of the Debtor since the 1976 appraisal. It was not even predicated upon the present management, but, rather, upon a hypothetical market share to be obtained by a hypothetical Berkshire County resort bearing little current resemblance to the Debtor. As a consequence, Steinhardt valued the

Debtor's premises at $3,600,000.00 using the same capitalization of income test.

35. The major disparity between the appraisals made by the Bank and the Debtor was the Debtor's "projection", as opposed to the Bank's actual use of historical experience. Concern was expressed at trial by this Court as to how Steinhardt could presently appraise the value of the Debtor's property in excess of his 1976 appraisal value. The Debtor had not even achieved a fraction of the income during the intervening years to validate the original 1976 valuation of $3,200,000.00 let alone the current increased valuation of $3,600,000.00.

36. When Steindardt valued the Debtor's property, using the capitalization of earnings test, he valued the business resort complex at $2,400,000.00 and added an additional $1,200,000 in value for the "surplus" land surrounding the resort. Connor's valuation for the bank, based also upon the capitalization of earnings test, valued the entire property at $1,100,000.00. Connor used actual sales figures for the business and actual historical experience for comparable land sales in arriving at his figure. Connor's valuation of the "surplus" acreage surrounding the business buildings was significantly less than that of Steinhardt. In fact, his appraisal of the "surplus" land had, except for 300 acres of perimeter land, reduced in value from his 1978 appraisal. His undisputed reason for this reduction was the change in valuation of comparable parcels. Connor testified that small lot sales, popular in 1978, had given way to large lot sales in 1983. As a consequence of this change in lot size preference and because of the increased costs of interior development and sub-division work, owing to Jug End's limited road frontage, Connor testified that developers would not find Jug End surplus land attractive. In fact, he stated that the absence of town sewerage and the likelihood of septic percolation problems would help to discourage development, especially in light of the

current availability of land which lacked all the aforementioned complications.

## DISCUSSION

1. Upon the filing of a petition for bankruptcy an automatic stay arises by operation of law.[5] The stay prevents the bankrupt's creditors from seeking to enforce any lien on the property of the estate and affords the debtor a "breathing spell." *La Jolla Mortgage Fund v. Rancho El Cajon Associates,* 18 B.R. 283, 286 (Bankr. S.D.Cal.1982). Also provided in the Bankruptcy Code is a procedure by which a creditor can seek to have the stay lifted with respect to his claim under 11 U.S.C. § 362(d). Section 362(d) provides as follows:

> On request of a party in interest and after notice and hearing, the court shall grant relief from the stay provided under subsection (a) of this action, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> (2) with respect to a stay of an act against property, if—
>
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization.

Since § 362(d) of the Bankruptcy Code is phrased in the disjunctive, the moving party need prevail on only one of the two alternative tests to obtain relief from the automatic stay. *La Jolla Mortgage Fund, supra.*

### Relief From Stay Under § 362(d)(1)

2. The first test under § 362(d)(1) states that a creditor is entitled to relief from the automatic stay of § 362(a) if there is a lack of adequate protection. Adequate protection, as derived from the fifth

---

5. Section 362 of the Bankruptcy Code provides that the filing of a petition operates as a stay of litigation, lien enforcement and other actions which would affect or interfere with the proper-

ty of or in the custody of the estate as well as property of the debtor. 2 Collier on Bankruptcy 2d § 362.01, at 363–5 to –6 (15th ed. 1979).

amendment protection of property interests, *see Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), reconciles the competing interests of the debtor, on the one hand, who needs time to reorganize free from harassing creditors, and the secured creditor, on the other hand, who is entitled to constitutional protection for his bargained for property interest.[6] *See* H.R. 95–595, 95th Cong., 1st Sess. (1977), U.S. Code Cong. & Admin.News 1978, p. 5787. The intent of adequate protection is not confined to constitutional protection, but also encompasses the policy grounds of not depriving secured creditors of the benefit of their bargain. *In re Winslow Center Associates*, 32 B.R. 685, 688 (Bankr.E.D.Pa. 1983). By providing the creditor with a means of protection for the creditor's interest, the debtor is allowed to continue his reorganization free from the harshness of a relief from stay.

■ 3. Although not specifically mentioned in § 361, the classic protection for a secured debt justifying continuation of the stay is the existence of an "equity cushion." *In re Curtis*, 9 B.R. 110, 112 (Bankr. E.D.Penn.1981). An equity cushion is the value in the property above the amount owed to the creditor with a secured claim that will protect that creditor's secured interest from decreasing in value during the period that the automatic stay remains in effect. *In re Roane*, 8 B.R. 997, 1000 (Bankr.E.D.Pa.1981), aff'd. 14 B.R. 542 (D.C.E.D.Pa.1981). It has been held that an equity cushion, standing alone, can provide adequate protection, *In re San Clemente Estates*, 5 B.R. 605, 610 (Bankr.S.D. Cal.1980); *In re Tucker*, 5 B.R. 180, 182 (Bankr.S.D.N.Y.1980), and that a sufficient

equity cushion can exist although not a single mortgage payment has been made. *In re Curtis, supra*, at 111. A 15% to 20% equity cushion has been held to be sufficient to provide adequate protection to a creditor even though the debtors have no equity in the property, *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr.E.D. Va.1980) but a 17% to 18% cushion has been held not to offer adequate protection where the cushion was being rapidly eroded by the daily accrual of interest on the debt. *In re Schaller*, 27 B.R. 959 (D.W.D. Wis.1983). *See also, In re McGowan*, 6 B.R. 241, 243 (Bankr.E.D.Pa.1980) [holding a 10% cushion is sufficient as adequate protection where monthly payments are proposed to cover the interest accruing on the claim]; *In re Pitts*, 2 B.R. 476, 478 (Bkrtcy.C.D.Cal.1979) [holding a 15% cushion is "minimal"]; *In re LeMay*, 18 B.R. 659 (Bankr.D.Mass.1982) [holding a 7% equity cushion will rarely provide sufficient protection].

■ 4. The equity cushion offered in this case is plainly inadequate and continues to deteriorate rapidly. The record shows that the Debtor has made no payment since December, 1982 and that interest continues to accrue as a result.[7] The total amount of money owed by the Debtor to the Bank on its first mortgage, second mortgage and secured small loan combined was $1,181,626.56 on July 18, 1984, the last day of trial. The existence of that debt, when compared to Connor's 1983 appraisal value for the Jug End property of $1,100,-000.00, leaves no equity cushion to protect the Bank's interest in the Debtor's property. Were that debt compared to the 1983 Connor valuation using a 13.7% cap rate, which the Debtor argued was the correct rate,[8] rather than the 16% cap rate which

---

**6.** Collier equates adequate protection with a balancing of the debtor's and creditor's respective harm. 2 Collier on Bankruptcy 2d § 362.07[1], at 362–49 (15th ed. 1979).

**7.** Although the amount of a creditor's claim is fixed as of the date the Bankruptcy petition is filed, § 506(b) of the Bankruptcy Code allows a creditor to claim interest if the following condi-

tion is met: the creditor's claim must be secured by collateral which has a value greater than the creditor's claim as fixed at the commencement of the bankruptcy proceedings. *In re Pond*, 43 B.R. 522 (Bankr.D.N.D.1984).

**8.** The 1983 Connor appraisal value would be $1,288,000.00 if a 13.7% cap rate were used.

Connor used, there would remain an equity cushion of 8.3%, a percentage still clearly unacceptable in the face of the continuous erosion of that cushion by daily interest costs.

5. This Court chose to utilize the 1983 valuation figure as provided by Connor for the Jug End properties rather than that provided by Steinhardt. No property value, as determined by appraisal, rests on scientific analysis. *In re Mikole Developers, Inc.,* 14 B.R. 524 (Bankr.E.D.Pa.1981). Rather, individuals experienced in analyzing properties offer their educated opinions as guidance for the court which need not be bound by them. *In re Development, Inc.,* 36 B.R. 998 (Bankr.D.Hawaii 1984). In this case, the Court placed more confidence in a valuation based upon actual historical figures than one which utilized a hypothetical management in a hypothetical resort which bore little current resemblance to the Debtor.

6. With the Connor valuation clearly presenting a prima facie case under § 362(d)(1) of an inadequate equity cushion, the burden shifts from the creditor to the Debtor to prove that the Bank's security interest is adequately protected. *In re Gauvin,* 24 B.R. 578 (Bankr.App. 9th Cir. 1982); *In re Kane,* 27 B.R. 902, 905 (Bankr. M.D.Pa.1983).

7. The Bankruptcy Code does not expressly define the term "adequate protection," *In re Saypol,* 31 B.R. 796 (Bankr.S. D.N.Y.1983), but does provide in § 361 for those situations in which an alternate means of protecting a secured creditor's interest may be preferable to giving the secured creditor the absolute right to his bargain.[9] Though the creditor's bargain

may not be received in kind, the Bankruptcy Code insures that the creditor receive in value essentially what was bargained for. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339, reprinted in *In re Winslow Center Associates, supra,* at 688. The creditor, consequently, receives the same *measure* of protection in bankruptcy that he would have received outside bankruptcy but the *type* of protection may differ. *Id.*

8. Section 361 sets forth three non-exclusive methods by which adequate protection of the Bank's interest in the property may be provided. *See supra* note 8. The Brunos have not proposed to make periodic cash payments to the Bank nor have they proposed to place additional or replacement liens on other property, as set forth in the first two methods of § 361. They have relied solely on the property to provide adequate protection and have not proposed any other means of providing such protection as provided for in the third "catch all" method set forth in § 361.

9. Since the Debtor does not refute or undercut the Bank's substantiated averments that there is an insufficient equity cushion protecting the creditor's security interest, relief from stay is granted "for cause" under § 362(d)(1). *In re Curtis, supra; In re Kane, supra.*

### Relief From Stay Under § 362(d)(2)

■ 10. Were the equity cushion found to be adequate or were the Debtor able to provide an alternative means of adequate protection to the Bank, relief from stay could still be granted to the Bank provided that the requirements of the second test of § 362 of the Bankruptcy Code were met. Under the adequate protection test of

---

9. Section 361 of the Bankruptcy Code provides three non-exhaustive examples of adequate protection. They are:

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

§ 362(d)(1) the debtor's lack of "equity" in the estate is not, by itself, sufficient to grant relief from the automatic stay. *In re Suter,* 10 B.R. 471, 472 (Bankr.E.D.Penn. 1981). An equity cushion can exist and protect the moving creditor's interest in the debtor's property even where the debtor lacks equity in that property. Under § 362(d)(2), however, the lack of debtor equity in property coupled with the fact that the property is not necessary to an effective reorganization is cause to modify the stay.

■ 11. For the purposes of § 362(d)(2)(A), the bankruptcy courts have differed over the proper definition of "equity." The minority view subtracts from the value of the property only those amounts owed to the lienholder challenging the stay and to those lienholders more senior. *See, e.g., In re Cote,* 27 B.R. 510, 513 (Bankr.D. Or.1983); *In re Palmer River Realty, Inc.,* 26 B.R. 138, 140 (Bankr.D.R.I.1983); *In re Certified Mortgage Corp.,* 25 B.R. 662, 663 (Bankr.M.D.Fla.1982). The majority view, on the other hand, defines equity as the difference between the property value and the total amount of liens against it. *See, e.g., In re Faires,* 34 B.R. 549, 551 (Bankr. W.D.Wash.1983); *In re Shriver,* 33 B.R. 176, 186–87 (Bankr.N.D.Ohio 1983); *In re Trina-Dee, Inc.,* 26 B.R. 152, 154 (Bankr.E. D.Pa.1983), aff'd. sub. nom. *Nazareth National Bank v. Trina-Dee, Inc.,* 731 F.2d 170 (3d Cir.1984); *In re St. Peter's School,* 16 B.R. 404, 408 (Bankr.S.D.N.Y.1982); *In re Dallasta,* 7 B.R. 883, 885 (Bankr.E.D.Pa. 1980); *La Jolla Mortgage Fund, supra.* Since the statute simply refers to the debtor's "equity" and not to the debtor's equity as against only that lienholder seeking to lift the stay or persons senior to the moving lienholder, *Stewart v. Gurley,* 745 F.2d 1194, 1196 (9th Cir.1984), this Court follows the majority view. The existence of junior lienholders is relevant, therefore, to § 362(d)(2) and not to § 362(d)(1). *La Jolla Mortgage Fund, supra,* at 289.

12. In the instant case, in addition to the $1,181,626.56 owed as of the last day of trial by the Debtor to the Bank (on its first mortgage, second mortgage and secured small loan combined) the following secured claims are held by lienholders junior to the Bank: approximately $190,000.00 on the SBA second mortgage; $240,000.00 and $50,000.00 for two Schedule A–2 junior mortgages claimed but contested by the Debtor; approximately $995,290.00 in federal tax liens; $456,602.00 in claimed Massachusetts state tax liens; $71,089.10 in unpaid real estate taxes for 1983 and 1984, exclusive of accrued interest; and $795,051.24 in recorded attachments and other liens on the property of the Debtor (recorded beyond ninety days prior to the filing of the Chapter 11 petition). Exclusive of the contested mortgages totaling $290,000.00, the total debt secured by the Jug End properties is approximately $3,689,658.00. Even in the face of the highest Jug End appraisal of $3,600,000.00, which the Court explicitly rejects, there remains no equity for the Debtor in the Jug End properties after the debts of the lienholders are satisfied.

■ 13. The moving creditor in a motion for relief from stay proceeding has the burden of establishing the validity and perfection of its security interests, the amount of the debt and other costs and expenses allowed by the security instrument and must carry the ultimate burden of proof with respect to equity. *In re Irving A. Horns Farm Inc.,* 42 B.R. 832 (Bankr.D. Iowa 1984); *United Companies Financial Corp. v. Brantley,* 6 B.R. 178, 184 (Bankr. N.D.Fla.1980). As already noted, there is no equity in the Jug End property for the Debtor, and the mortgages held by the Bank along with the security interests are not issues as a consequence of having been admitted by the Debtor. Additionally, the amount of the debt, as testified to by a Bank official (in accordance with the bank's official records), remains uncontradicted by the evidence. In view of the foregoing, this moving creditor has met his burdens of proof, shifting the burden of proof to the debtor in possession with respect to the

property's being essential to an effective reorganization. 11 U.S.C. § 362(g). To meet that burden, the debtor must do more than merely assert that the property is necessary to an effective reorganization. *In re Mikole Developers, supra; In re Terra Mar Associates,* 3 B.R. 462 (Bankr. D.Conn.1980). As explained by the court in *In re Clark Technical Associates, Ltd.,* 9 B.R. 738 (Bankr.D.Conn.1981):

> It is not enough for a debtor to argue that the automatic stay should continue because it needs the secured property in order to propose a reorganization. If this were the test all property held by debtors could be regarded as necessary for the debtor's reorganization. The keyword under 11 U.S.C. § 362(d)(2)(B) is "effective"; ...

> If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that reorganization in the near future is likely, it cannot be said that the property is necessary to an "effective" reorganization. (Citations omitted). *Id.* at 740.

■ 14. The debtor would have this Court follow the liberal test in *In re Koopmans,* 22 B.R. 395, 396–408 (Bankr.D.Utah 1982) which states that "property in which the debtor has no equity is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation." Rather than hold the term "reorganization" to encompass both the concept of rehabilitation and liquidation, even where the debtor has no equity in the property, this Court prefers to require that the debtor show not only that the property is neces-

sary to an effective reorganization but that an effective reorganization is possible and the property will contribute to it. *In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bankr.S.D.N.Y.1982). The debtor need not show that it has actually proposed a plan which is acceptable to its creditors. *In re Saypol, supra.* The debtor need only demonstrate a reasonable probability that it will be able to propose a plan for a successful reorganization within a reasonable time.[10] *Id.* A reasonable probability cannot be grounded solely on speculation, however, and a "mere financial pipe dream" is insufficient to meet the requirements of § 362(d)(2). *In re Dublin Properties,* 12 B.R. 77, 81 (Bankr.E.D.Pa.1981).

■ 15. The Bruno's have failed to demonstrate that there exists a reasonable likelihood of a successful reorganization within a reasonable period of time, and, therefore, have failed to establish that the property is necessary for an effective reorganization. *In re Sundale Associates, Ltd.,* 11 B.R. 978 (Bankr.S.D.Fla.1981). No evidence has been presented to indicate that a prospective investor or buyer is ready, willing and able to purchase the property. All attempts, to date, to procure a prospective investor or buyer have been unsuccessful. Hence, any proposed plan or reorganization would be founded only on the hope that such an individual may yet be located.

16. The Bruno's have presented no evidence of a realistic prospect for a successful reorganization or for the development or sale of the property within a reasonable time, and as was commented by the court in *In re Terra Mar Associates, supra,* at 466

10. The Debtor asserted that legislative history demonstrates Congress' intent not to utilize § 362(d)(2) where the Debtor is a hotel operation, as is Jug End. The Congressional Record with regard to this matter states however, that "[t]he section is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity *if the property*

*is necessary to an effective reorganization of the debtor."* (emphasis added) 124 Cong.Rec. H11092–93 (daily ed. Sept. 28, 1978) S17409 (daily ed. Oct. 6, 1978). The Congressional Record, therefore, indicates that the Debtor must still demonstrate that there is a reasonable likelihood of reorganization within a reasonable time in order not to have the section apply.

The short of it is that the debtor is utilizing the ... stay, hoping that somewhere, someone will fund an arrangement or refinance the mortgage with the plaintiff. This is entirely too slim a reed upon which this court should exercise its discretion and keep the plaintiff at bay while the debtor continues to pray. *In re Groundhog Mountain Corp.*, 1 B.C.D. 923, 926 (B.C.S.D.N.Y. 5/6/75).

## CONCLUSION

The evidence before the Court does not reflect the existence of a sufficient equity cushion to protect the Bank's interest. Nor does the evidence reflect sufficient cash flow from the Debtor's business operation to pay those expenses which daily accrue to erode the meager cushion which does exist. In addition, the record shows that the Debtor retains no equity in its property and that there is no reasonable likelihood of a successful reorganization within a reasonable period of time.

Having considered the benefits and harms to each party, this Court concludes that just cause exists under both § 362(d)(1) and § 362(d)(2) to modify the stay and allow the Bank to foreclose upon its security.

## ORDER

In accordance with the above, the motion of the First Agricultural Bank seeking modification of the automatic stay is ALLOWED.