**In re ISLAND HELICOPTER CORP., et al, Debtors.**

**Bankruptcy Nos. 884–40672–18 thru 884–40681–18.**

United States Bankruptcy Court, E.D.N.Y.

June 27, 1986.

See also, 63 B.R. 515.

Shaw, Goldman, Licitra, Levine & Weinberg, P.C., Garden City, N.Y., for debtors.

Zalkin, Rodin & Goodman, New York City, for Chemical Bank.

C. ALBERT PARENTE, Bankruptcy Judge.

Chemical Bank (hereinafter "Chemical") has moved for an order to vacate the automatic stay under 11 U.S.C. § 362(d) to commence foreclosure on its security interests in the subject collateral, to wit, three Gates Lear Jets. Chemical seeks vacatur of the stay on two grounds: 1) the debtors lack equity in the collateral and the collateral is not necessary for an effective reorganization, 11 U.S.C. § 362(d)(2); and, 2) the debtors have not provided Chemical with adequate protection, 11 U.S.C. § 362(d)(1). In the alternative, Chemical requests that the debtors' continued use of the jets be conditioned on the adequate protection of Chemical's security interests in the collateral.

The debtors oppose Chemical's motion and dispute Chemical's contention that the collateral is not necessary for an effective reorganization. The debtors assert that the continued use of the collateral is an integral component of their rehabilitation and the successful implementation of their plan of reorganization. The debtors also contend that Chemical has been provided with adequate protection in the form of regular maintenance of the collateral and

replacement liens on all new engines installed in the jets.

FINDINGS OF FACT

1) The debtors, Island Helicopter Corp. and its related corporations, filed for relief under Chapter 11 of the Bankruptcy Code on April 19, 1984 (hereinafter "filing date").

2) In 1978 and 1979, Chemical financed the debtors' purchase of three Gates Lear jets, FAA Registration Nos. N41BJ, N450, and N400 (hereinafter "collateral") for use by Business Jet Air, a wholly-owned subsidiary of the debtors. Chemical obtained security interests in the three jets and their accompanying engines as collateral for these loans, and duly recorded these security interests in accordance with FAA regulations. Aircraft N41BJ is a Lear 24 model; the other two jets are Lear 25 models.

3) On the filing date, the debtors owed Chemical $2,377,639.74 in outstanding principal, plus an additional $47,707.51 in accrued interest.

4) On September 19, 1985, Chemical moved to vacate the automatic stay to foreclose on its security interests, or, in the alternative, for an order conditioning the debtors' use of the collateral on providing Chemical with adequate protection. Subsequent to a breakdown in settlement negotiations between the parties, Chemical requested a hearing date on its motion at the earliest possible date. Accordingly, the hearing on this motion commenced on April 8, 1986 and concluded on April 16, 1986. This court received post-hearing memoranda of law from the parties on June 2, 1986.

5) On the filing date, the aggregate fair market value of the collateral was $1.6 million.[1]

6) Pursuant to an appraisal of the collateral by Mr. Bath dated June, 1985, the aggregate adjusted fair market value of the collateral was $1.21 million.

The values for these aircraft were determined by applying adjustments to a base aircraft value. The base value is derived from an analysis of market factors such as supply and demand. The base value was increased to represent modifications or additional equipment not generally found on aircraft of similar model and age. The debtors have installed thrust reversers on all three jets. The installation of these devices enhances the jets' values by increasing the landing capabilities of the aircraft. The debtors have also increased the values of Aircrafts N400 and N450 by refurbishing the cabin interiors. Deductions to the base value primarily reflected the need for engine overhaul and upgrade of the general condition of the aircraft.

7) Mr. Bath testified that as of March, 1986, the aggregate adjusted fair market values of the jets was $1.05 million. This aggregate decrease in value from June, 1985 was primarily attributable to a decline in engine values resulting from decreases in the engines' time remaining to overhaul.

8) Mr. Bath testified that the base value of the collateral has remained relatively constant for at least the past year.

9) Patrick Mallon is the vice-president of technical services for Island Helicopter Corp. and supervises the maintenance of the collateral. In response to the June, 1985 appraisal, he testified that the maintenance records for Aircraft N41BJ indicated no hydraulic fluid or kerosene leaks as had been reported by Mr. Bath. Mr. Mallon explained that the purported fuel tank leak was due to the aircraft's inspection soon after refueling.

10) Since August, 1985, to the present date, Aircraft N41BJ has been out of oper-

---

1. William Bath, Chemical's appraiser, estimated the aggregate value of the jets at the filing date to be $1.7 million. His testimony was speculative since he did not have the opportunity to physically inspect the aircraft on or about the filing date. However, debtors' Exhibit A in Evidence is an appraisal of the jets dated July 30, 1984, conducted for Chemical by Daley-Hodkin Appraisal Corp. This appraisal relates the results of a physical inspection of the jets on May 11, 1984, approximately three weeks after the filing date. For the purposes of this hearing only, the court will attribute the fair market values listed in this appraisal to be the values of the jets as of the filing date.

ation due to the time expiration of its engines. Mr. Mallon testified as to the debtors' decision to purchase significantly less expensive overhauled engines rather than new engines. He further attested to the general difficulty in obtaining such overhauled engines for Lear 24 jets as the reason for this jet currently being grounded.

11) Peter McGann is the Chief Financial Officer of Island Helicopter Corp. His testimony corroborated with that of Mr. Mallon that the debtors' business encounters a slow period during the fall and winter seasons. Accordingly, the debtors concluded that the utilization of their available cash funds during this slow period to purchase replacement engines for Aircraft N41BJ would be imprudent.

12) Mr. Mallon testified that a replacement engine had been installed on Aircraft N400 in lieu of an engine in which Chemical had originally recorded a security interest. The original engine was replaced because its usable life was close to expiration. In December, 1985, Aircraft N450 required the replacement of an engine. The original Aircraft N400 engine was installed on Aircraft N450 to take advantage of that engine's remaining usable life. The replacement engine purchased for Aircraft N400 cost $35,000 and had a usable life upon purchase of 1,487 hours remaining to overhaul.

The debtor has offered to protect Chemical's security interests by obtaining replacement engines for the aircraft as needed. The debtors have also offered Chemical replacement liens on all newly acquired engines installed in the three Lear jets.

13) Since the filing date, the debtors have spent an estimated $388,345 to repair, maintain, and improve the condition of the jets.

14) At the time of the hearing, Aircraft N450 was undergoing its FAA mandated 12 year inspection in San Antonio, Texas. The debtors projected that this inspection would be completed by May 1, 1986.

15) Aircraft N400 is scheduled to commence its 12 year inspection upon Aircraft N450's return from its inspection.

16) The debtors have committed an estimated $170,000 to cover the costs of the 12 year inspections of the two Lear 25 jets.

17) On January 31, 1986, the debtors filed their proposed Plan of Reorganization and Disclosure Statement. As of the date of this hearing, no creditor, including Chemical, had filed an objection to either the Plan or Disclosure Statement. The projected effective date of confirmation on the Plan is September 1, 1986.

18) The Disclosure Statement outlines the relationship between the debtors and Business Jet Air, a corporate jet charter company that is a division of Island Helicopter Corp. Business Jet Air operates the collateral in its course of business. The Disclosure Statement represents a significant interrelationship between helicopter and jet customers. The Disclosure Statement further details the new marketing programs instituted by the debtors to capitalize on the interrelatedness of customers using jets and helicopters. Specifically, the debtors have implemented a Charter Club marketing program which offers retroactive volume discounts to induce customers to exclusively use the debtors' jet and helicopter chartering services. The debtors have also developed a four-color marketing brochure which highlights the debtors' ability to offer both helicopter and jet chartering services.

19) George Dempster, Chairman of the Board of New York Helicopter, one of the related debtor corporations, testified that the integrated marketing concepts are an accepted and commonly used industry practice. Mr. Dempster testified that the debtors' ability to offer jet as well as helicopter services is an important marketing tool to retain present customers and attract new customers. The utilization of this marketing strategy thus seeks to increase the debtors' profitability by integrating the helicopter and jet services offered by the debtors into a single marketing distribution system. Mr. Dempster offered statistical evi-

dence that through debtors' use of this strategy, they can increase their overall profitability even if the charter jet service itself fails to realize a profit.

20) The proposed plan of reorganization provides for payment to Chemical to the full extent of its allowed secured claim, to be determined by this court pursuant to 11 U.S.C. § 506(a) in pending adversary proceeding No. 885–0176–18. Such payment shall consist of deferred cash payments in 18 biannual installments, with interest to be paid at the annual rate of 9%.

DISCUSSION & CONCLUSIONS OF LAW

The automatic stay of creditors is indispensable to the effective administration of the Chapter 11 reorganization. *See generally,* 11 U.S.C. § 362(a). The stay prevents a dissipation of the debtor's assets at the onset of the bankruptcy to satisfy individual claims at the expense of the general creditor body. Creditors are enjoined from acting on their claims against the debtor's estate to ensure that all creditors are equitably treated. H.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in,* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6297.

Cognizant of the potentiality of harm to secured creditors as a consequence of the stay, Congress provided creditors with an expedited procedure for seeking relief from the stay. Under Section 362(d), creditors may obtain a vacatur of the stay in two instances: 1) where the debtor has no equity in the subject property and such property is not necessary to an effective reorganization of the debtor entity, 11 U.S.C. § 362(d)(2); or, 2) for cause, including the lack of adequate protection of a secured creditor's interest in its collateral, 11 U.S.C. § 362(d)(1).

Section 362(e) also acknowledges the stay's adverse impact on creditors by establishing a time certain within which the bankruptcy court must determine whether it will grant the requested relief from the stay. 1978 U.S.Code Cong. & Ad.News at 5841, 6300–01. Bankruptcy Rule 4001(b) augments this section and requires the court to reach its determination within 30 days of the final hearing on the request for relief. This court acknowledges and adheres to the policies incorporated into Section 362(e)'s accelerated timetable. In further recognition of the complex issues raised by the parties during the hearing and upon the tacit consent of the parties, this court has issued the following decision within 30 days of its receipt of the post-hearing memoranda of law. *Accord, In re McNeely,* 51 B.R. 816, 820–21 (Bkrtcy.D. Utah 1985).

Since the debtors concede that they lack equity in the jets, two issues are before this court:

1) Are the jets necessary to the debtors' effective reorganization?

2) Are Chemical's security interests in the collateral adequately protected?

The debtors, as the parties opposing relief from the stay, have the burden of proof on both of these issues. 11 U.S.C. § 362(g)(2).

1) Property necessary for an effective reorganization—Section 362(d)(2)(B)

■ A review of the relevant case law distinguishes between two divergent tests used by courts to effectuate Section 362(d)(2)(B). A preponderance of the courts have used a "feasibility test" which requires a debtor to demonstrate that a successful reorganization is reasonably possible within a reasonable time. *In re Greiman,* 45 B.R. 574, 579, 11 C.B.C.2d 1299 (Bkrtcy.N.D.Iowa 1984), *In re Bellina's Restaurants II, Inc.,* 52 B.R. 509, 512 (Bkrtcy.S.D.Fla.1985), *In re Engle,* 51 B.R. 190, 191–92 (Bkrtcy.E.D.Penn.1985), *In re Moor,* 51 B.R. 640, 642–44 (Bkrtcy.N.D. Miss.1985). However, the "feasibility test" has been criticized as being both impractical within the context of the expedited automatic stay hearing, *In re Sunstone Ridge Associates,* 51 B.R. 560, 562, 13 C.B. C.2d 286 (D.Utah 1985), and incompatible with a court's restrictive inquiry under Section 362(d). *In re Koopmans,* 22 B.R. 395, 9 B.C.D. 514, 6 C.B.C.2d 1414 (Bkrtcy.D. Utah 1982). Consequently, a minority of

courts has chosen to utilize a "necessity test" that solely examines whether the collateral will contribute to the debtors' reorganization. *In re Koopmans*, 22 B.R. at 397; *see also, In re Independence Village Inc.*, 52 B.R. 715, 723, 13 B.C.D. 637, 13 C.B.C.2d 476 (Bkrtcy.E.D.Mich.1985), *In re Keller*, 45 B.R. 469, 472 (Bkrtcy.N.D.Iowa 1984), *In re W.S. Sheppley & Co.*, 45 B.R. 473, 479, 12 B.C.D. 709 (Bkrtcy.N.D.Iowa 1984).

This court concludes that a debtor will satisfy its burden of proof under Section 362(d)(2)(B) if it can establish through *prima facie* evidence that the collateral will likely play a significant role in the successful implementation of the debtors' proposed reorganization efforts. Section 362(d)(2)(B) by its plain meaning necessitates a court's investigation into the reasonableness of debtors' prospects for a successful financial rehabilitation. *In re Bellina's Restaurants II, Inc.*, 52 B.R. at 512. Thus, a narrow "necessity test" would impede the court's ability to examine the probable relationship between the collateral and the success of the debtor's rehabilitative efforts. *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 902 (Bkrtcy.D. Mass.1985). Where the collateral is a constituent part of a plausible reorganization strategy, a debtor's retention of the collateral will better serve the debtor's estate and general creditor body than an individual creditor's foreclosure. *In re Penny*, 52 B.R. 816, 819–20 (Bkrtcy.E.D.N.C.1985).

This court's reading of Section 362(d)(2)(B) does not grant a creditor moving under that section carte blanche to impugn the overall integrity of the debtor's plan of reorganization. The movant under Section 362(d) expresses a specific concern for its rights in certain property of the estate. *In re Koopmans*, 22 B.R. at 398. The court will thus entertain arguments which support or oppose a reorganization plan only to the extent that the proffered evidence aids the court in determining the proposed function of the collateral in the reorganization.[2] *In re Greiman*, 45 B.R. at 580. Although the debtor need not defend the veracity of its reorganization proposals in the context of an automatic stay hearing, the debtor cannot meet its burden of proof through mere conjecture and speculation. *In re Engle*, 51 B.R. at 192, *In re Moor*, 51 B.R. at 642–44. The automatic stay will remain operative only if the debtor demonstrates that its prospects of an effective reorganization are well founded and that the integral role in the reorganization that it has assigned to the collateral has a justifiable basis. *In re Saypol*, 31 B.R. 796, 802–04, 10 B.C.D. 1057 (Bkrtcy.S. D.N.Y.1983).

In this case, the debtors' integrated marketing strategy, as outlined in the Findings of Fact above, details the proposed role of the jets in the debtors' reorganization. This strategy is at the core of the debtors' attempts to restructure into an economically viable business operation.

Chemical has gone to great lengths to belittle the integrated marketing strategies as high hopes and nothing more than a prayer. However, Chemical has been unable to offer any evidence that refutes the accepted industry use of integrated marketing as a legitimate business marketing tool.

The debtors' use of these marketing concepts has derived from their deliberative investigation into those business practices that can best contribute to its successful financial rehabilitation. The fact that the debtors have already begun to expend funds to institute the integrating marketing strategy signifies the debtors' commitment to a successful reorganization. *In re Vacation Village Ltd. Partnership*, 49 B.R. 644, 645 (Bkrtcy.N.D.Iowa 1983).

**2.** In contrast, a creditor moves under Section 1112(b)(1) to dismiss the Chapter 11 petition or convert it to a Chapter 7 liquidation where there exists no reasonable likelihood of a debtor's reorganization. An expansive interpretation of Section 362(d)(2)(B) could render Section 1112(b)(1) meaningless and subject a debtor's reorganization to constant, premature attack upon each creditor's request for relief from the stay under Section 362(d)(2). *In re Koopmans*, 22 B.R. at 401, *In re Keller*, 45 B.R. at 471.

The court is convinced that at the present time the debtors' prospects for a successful reorganization are founded on sound business practice. *Accord, In re Independence Village, Inc.,* 52 B.R. at 724–26. The debtor entities have undergone dramatic transformation in each and every aspect of their operations during these Chapter 11 proceedings. Absent strong evidence that the theoretical basis of the debtors' reorganization is invalid and unsubstantiated, this court is loathe to render a judgment that will abort the nascent reorganization.

 Chemical additionally contends that the jets are fungible and thus not necessary.[3] However, collateral need not be unique to constitute property necessary to an effective reorganization. *In re Koopmans,* 22 B.R. at 405. Rather, the court must determine on a case by case basis how a substitution of new assets for the existing collateral will affect the overall estate beyond the concerns of an individual creditor. *Id.; accord, In re Comcoach Corp.,* 19 B.R. 231, 234, 8 B.C.D. 1077 (Bkrtcy.S.D.N.Y.1982). Here, the debtor has already incurred certain expenses which represent an increase in the value of the collateral. If the debtors were now to be required to lease or buy new jets, not only would they be unable to take advantage of these investments, but they would be required to expend funds that could be better utilized elsewhere in the reorganization. At this late stage in the debtors' reorganization upon the eve of a confirmation hearing, the best interests of the debtors' estate and general creditor body will not be served by requiring the debtors to disrupt its reorganization efforts and obtain replacement jets to substitute for Chemical's collateral.

 The court finds that the debtors have met their burden of proof by demonstrating to the court's satisfaction that: 1) the collateral is necessary to the debtors' effective reorganization; 2) a reasonable possibility exists that the debtors will reorganize within a reasonable period of time. Accordingly, Chemical's request for relief under Section 362(d)(2) is denied.

### 2) Adequate Protection

 A debtor is required to maintain the value of the secured creditor's interest in its collateral during the pendency of the bankruptcy. Adequate protection compensates a secured creditor for the loss of such value where the automatic stay precludes a creditor from otherwise acting to protect its interests. 1978 U.S.Code Cong. & Ad. News at 5835–40, 6295–96. Chemical maintains that adequate protection must therefore compensate a secured creditor for the lost opportunity of asserting its rights in the collateral through foreclosure and thereafter reinvesting the foreclosure proceeds. Chemical asks this court to embrace the analysis of the Ninth Circuit in *n re American Mariner Industries, Inc.,* 734 F.2d 426, 12 B.C.D. 227, 10 C.B.C.2d 910 (9th Cir.1984), and to adopt that court's holding that an undersecured creditor stayed from repossessing its collateral is entitled to compensation for the present value of its right to foreclose. Although the Fourth and Eighth Circuits have followed *American Mariner, Grundy Nat. Bank v. Tandem Min. Corp.,* 754 F.2d 1436, 12 C.B.C.2d 264, (4th Cir.1985), *In re Martin,* 761 F.2d 472, 12 C.B.C.2d 974 (8th Cir.1985), the Second Circuit has yet to decide this issue.[4]

---

**3.** Chemical cites a string of cases in support of its argument. However, these cases are predominantly concerned with the Chapter 13 debtor's place of residence and mode of transportation and, as such, are inapt and nonbinding.

**4.** This court recognizes that two courts in this circuit have supported the inclusion of lost opportunity cost in adequate protection, *In re Air Vermont,* 45 B.R. 931, 935 (Bkrtcy.D.Vt.1985), *In re Anchorage Boat Sales, Inc.,* 4 B.R. 635, 641–

44, 6 B.C.D. 495, 2 C.B.C.2d 348 (Bkrtcy.E.D.N.Y.1980), and two courts have interpreted adequate protection to protect only the loss in the collateral's value due to depreciation. *In re Saypol,* 31 B.R. at 799–800, *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 824–26, 8 B.C.D. 1402, 6 C.B.C.2d 713 (Bkrtcy.S.D.N.Y.1982).

The court in *In re Air Vermont* implicitly adopted the *American Mariner* holding *in toto*

In *American Mariner*, the court rejected the debtor's contention in that case that adequate protection should focus only on the value of the collateral itself. 734 F.2d at 430. Citing to the legislative history supporting Section 361, 1978 U.S.Code Cong. & Ad.News at 6295, the Ninth Circuit noted that adequate protection is intended to insure that the secured creditor receives in value the benefit of its bargain. The court then reasoned that a secured creditor's bargained for interest in the collateral includes its rights of repossession and sale; thus, adequate protection must protect the present value of this interest. *Id.* at 431.

The *American Mariner* holding relies heavily on the inclusion of the term "indubitable equivalent" within Section 361(3), as derived from language used by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935). Judge Hand analyzed the adequate protection concept from the perspective of the court's power to confirm a plan of reorganization over creditor's objections where the plan adequately protects the realization of the full value of the creditors' claims. 734 F.2d at 433. In that context, he found that adequate protection should compensate for the present value of an allowed secured claim, as well as insure the safety of the underlying principle. The term "indubitable equivalent" is used within the cramdown provisions of Section 1129(b) to require such compensation for present value in the reorganization plan. *Id.* The Ninth

Circuit perceived a nexus between the use of the terms "adequate protection" and "indubitable equivalent" in Section 1129, and their use in Section 361. *Id.* at 434.

Prior to the Ninth Circuit's ruling in *American Mariner*, many courts had premised the inclusion of compensation for lost opportunity cost in adequate protection on the "indubitable equivalent" language of Section 361(3). *In re Saypol*, 31 B.R. at 801. Judge Buschman of this circuit was particularly wary of the different contexts within which Judge Hand and Section 361(3) employed this term. *Id.* This court agrees with Judge Buschman that the term "indubitable equivalent" was included in Section 361 solely to afford a court greater flexibility in protecting the secured creditor from the undue erosion of the value of its collateral during the operation of the stay. *Id.; see,* 1978 U.S.Code Cong. & Ad.News at 6295–96. We find that Congress clearly enunciated the proper role of adequate protection as follows:

Section 361(4) of H.R. 8200 as passed by the House is modified in section 361(3) of the House amendment to indicate that the court may grant other forms of adequate protection, other than an administrative expense, which will result in the realization by the secured creditor of the indubitable equivalent of the creditor's interest in property.... *Adequate protection of an interest of an entity in property is intended to protect a creditor's allowed secured claim.* To the ex-

by directing a debtor to protect its secured creditor for lost opportunity cost. 45 B.R. at 935. Many courts have followed the *American Mariner* decision. *Grundy Nat. Bank v. Tandem Min. Corp.*, 754 F.2d at 1441, *In re Martin*, 761 F.2d at 476–77, *Matter of Lippley*, 56 B.R. 524, 526–27 (Bkrtcy.N.D.Ind.1986), *In re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 457, 12 B.C.D. 1337, 12 C.B.C.2d 1099 (Bkrtcy.S.D.Texas 1985), *In re Mary Harpley Builder, Inc.*, 44 B.R. 151, 156 (Bkrtcy.N.D.Ohio 1984).

One court has refused to interpret *American Mariner* as holding that undersecured creditors are always entitled to receive post-petition interest in adequate protection as a matter of law. *In re Peach State Distributing Co.*, 58 B.R. 873, 876 (Bkrtcy.N.D.Ga.1986). Judge Thinnes, in *In re Keller*, 45 B.R. at 472–73, compared the *Amer-*

*ican Mariner* decision to the analysis set forth by Judge Mabey in *In re Alyucan Interstate Corp.*, 12 B.R. 803, 806, 7 B.C.D. 1123, 4 C.B. C.2d 1066 (Bkrtcy.D.Utah 1981), and *In re South Village Inc.*, 25 B.R. 987, 989, 9 B.C.D. 1332, 8 C.B.C.2d 42 (Bkrtcy.D.Utah 1982). *American Mariner* expressly rejected Judge Mabey's conclusion that adequate protection only protects against depreciation of the collateral where such decline in value erodes the allowed secured claim. In opposition to *American Mariner* Judge Thinnes concluded: "Having examined the opinion of the ninth circuit in *American Mariner*, this court declines to follow the ninth circuit as to do so would in essence eviscerate the Bankruptcy Code and make Chapter 11 reorganization virtually impossible to accomplish." 45 B.R. at 473.

tent the protection proves to be inadequate after the fact, the creditor is entitled to a first priority administrative expense under section 507(b). (Emphasis added.)

124 Cong.Rec.H. 11, 092 (Sept. 28, 1978); S. 17 408–9 (Oct. 6, 1978).

The inclusion of lost opportunity cost in adequate protection in actuality enables an undersecured creditor to accrue post-petition interest on the secured portion of its claim. However, Section 506(b) allows a claim for post-petition interest only where a creditor's allowed claim is oversecured, *i.e.*, where the value of the collateral is greater than the amount of the allowed secured claim. 1978 U.S.Code Cong. & Ad.News at 5854. Unmatured post-petition interest on claims that are not oversecured is specifically not allowed under Section 502(b)(2). This court does not read Section 506(b) to allow an undersecured creditor the realization of post-petition interest on the secured portion of its claim. *In re Saypol*, 31 B.R. at 800. Consequently, this court will not circumvent the clear intent of Congress and permit the accrual of unmatured post-petition interest to an undersecured creditor.[5]

This court also acknowledges certain realities underlying a creditor's right to foreclose on collateral. Before the foreclosure right has any measurable value to a creditor, a debtor must be in default of its mortgage and a creditor must take some affirmative action to foreclose.

■ Compensation for lost opportunity cost would appear to be warranted where a debtor is in default and its secured creditor has commenced foreclosure prior to bankruptcy. In such an instance, a creditor's security interest in its collateral has been reduced at the time of filing to its right to

foreclosure. This right to foreclose, rather than the right to secure a loan with collateral, would become the creditor's interest in the collateral that must be adequately protected.

Prior to a debtor's default, its creditor's right to foreclose is merely expectant and has no perceptible value. Compensation for lost opportunity cost where a debtor is not in default prior to bankruptcy creates a fiction that such a debtor has fallen into default after the bankruptcy filing. This fiction is necessary in order for a court to effectuate and assign value to a creditor's foreclosure right. The Code, however, evinces a strong predeliction against the enforcement of *ipso facto* contract clauses which place the debtor in default due to its bankruptcy filing. *See*, 11 U.S.C. §§ 363(1) and 541(c)(1). Consequently, this court cannot render a decision which deems a debtor to be in default of its contract obligations because of its bankruptcy filing.

■ Where the debtor is in default prior to bankruptcy and yet a creditor has not sought to foreclose prior to bankruptcy, a creditor has consciously decided not to act on its right to foreclose. The automatic stay then enjoins a creditor from first exercising this right after the bankruptcy filing, unless a creditor can obtain relief from the stay pursuant to Section 362(d). The imposition of the stay in bankruptcy is a business risk that must be presumed to factor into a creditor's decision not to foreclose. Other factors that might influence a creditor's decision include the costs of and time delay in foreclosure and the absence of a better business opportunity. Compensation for lost opportunity cost in this instance would grant a creditor the windfall of hindsight. Moreover, adequate protection in such form would enable a creditor to

---

5. *Contra, In re Bear Creek Ministorage, Inc.*, 49 B.R. at 459–60, *In re Deeter*, 53 B.R. at 629. These courts reason that their decisions only allowed protection for the interests of a secured creditor and, to the extent that a creditor's claim is unsecured, no protection was granted. These courts calculated adequate protection by ascertaining the amount of probable foreclosure proceeds and then determining the rate of return

that the creditor would realize from its reinvestment of the proceeds. The effect of this calculation is no different than permitting the undersecured creditor to realize some post-petition interest on its original investment in the debtor. A plain reading of Section 502(b)(2) in conjunction with Section 506(b) squarely precludes this result.

effectively disregard the intent of the stay through the court's retroactive exercise of a creditor's right to foreclose. Adequate protection must not be used to compensate a creditor for the loss of a better business opportunity. *In re Pine Lake Village Apartment Co.*, 19 B.R. at 827.

■ This court concludes that Chemical should not be compensated for the lost opportunity of enforcing its rights against the collateral. There is no indication in the record that Chemical acted on a default by the debtor prior to the bankruptcy filing. Subsequent to the Chapter 11 filing, Chemical waited approximately 17 months before it moved to vacate the automatic stay to commence foreclosure. Even then, Chemical continued to pursue the possibility of a settlement with the debtor for approximately six months. As a court of equity, this court will not permit Chemical to now benefit from almost two years of hindsight under the rubric of adequate protection. *In re Saypol*, 31 B.R. at 799–800, *In re Pine Lake Village Apartment Co.*, 19 B.R. at 824–26; *accord, In re Peach State Distributing Co.*, 58 B.R. at 875–76, *In re Independence Village*, 52 B.R. at 731.

■ It appears from the evidence adduced at this hearing that Chemical's security interests are being adequately protected. The record indicates that the debtors have taken significant steps to maintain and upgrade the value of the jets. The debtors have further offered Chemical replacement liens in all new engines purchased for the collateral. Consequently, Chemical's request for relief under Section 362(d)(1) is denied.

■ In cognizance of the debtors' attempts to secure replacement engines for Aircraft N41BJ and the impending 12 year inspections of the two Lear 25 jets, this court defers its final determination on adequate protection for an additional 45 days from the date of this decision. A hearing will be conducted at that time on the issue of adequate protection pursuant to 11 U.S.C. § 363(e). At that hearing, the debt-

ors will be required to submit to this court a report which indicates the following:

1) the debtors have obtained and installed new or overhauled engines in half-time condition to be used for Aircraft N41BJ, and have given Chemical replacement liens in the same;

2) the two Lear 25 jets, Aircrafts N400 and N450, have completed their 12 year inspection;

3) all three jets are being maintained in accordance with FAA standards and regulations;

4) the debtors have developed and will continue to implement a comprehensive maintenance program to insure the constant overhaul and upgrade of the interior and exterior of the three jets, as well as the jets' engines.

This court cautions the debtors that their failure to adhere to this court's directive could necessitate a modification of the adequate protection provided Chemical to the manner prescribed in Section 361(1). This court further advises the parties that at the above-stated hearing it will entertain any additional evidence offered by the parties that relates to whether Chemical's interests in the value of the collateral continue to be adequately protected by the debtors.

SETTLE ORDER.