**In re 6200 RIDGE, INC., Debtor.**

**Bankruptcy No. 86–05079F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 6, 1987.

Earl T. Stamm, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for movant, Continental Bank.

Max W. Gibbs, Sand, Gibbs, Marcu & Smilk, Broomall, Pa., for movants, Ruth Miller and Jack Yampolsky.

Margaret Gairo, Philips, Curtin & DiGiacomo, Philadelphia, Pa., for debtor, 6300 Ridge, Inc.

## OPINION

BRUCE FOX, Bankruptcy Judge:

The debtor, 6200 Ridge, Inc., filed a voluntary petition under chapter 11 of the Bankruptcy Code on October 31, 1986. Two weeks later, on November 13, 1986, Continental Bank ("Continental"), the holder of the second mortgage on the real property located at 6200–06 Ridge Avenue, filed a motion for relief from stay. A preliminary hearing on the motion was held on November 25 and December 2, 1986. *See* 11 U.S.C. § 362(e). On December 18, 1986, I issued a memorandum and order in which I declined to order that the automatic stay remain in effect pending the conclusion of the final hearing on the motion.[1]

---

1. My decision was based on the following conclusions:

    1. There is a reasonable likelihood that the debtor will meet its burden at the final hearing of establishing that Continental's interest in the property is adequately protected....

    3. There is a reasonable likelihood that Continental will meet its burden at the final

The final hearing was conducted on December 29, 1986. *See id.* ("If the hearing under this subsection is a preliminary hearing, then such final hearing shall be commenced not later than thirty days after the conclusion of such preliminary hearing.").

Upon consideration of all the evidence submitted in this matter, I will grant Continental[2] relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2).[3]

## I.

The debtor is a corporation formerly controlled by the late Alvin Pearlman. As its name implies, the debtor is the owner of a single asset, a piece of commercial real estate located at 6200–06 Ridge Avenue ("the property" or the "the real property") in the Manayunk section of Philadelphia, PA. The property consists of five stores, all connected. The buildings were constructed approximately sixty years ago and are in fair-to-average condition. The main problem is a roof leak that is in need of repair. Four of the stores are presently leased and one is vacant. Continental has been mortgagee-in-possession of the property since March 1985 and presently receives approximately $2,600.00 monthly in rentals.[4] The debtor is not actively engaged in any business activity at this time and has not been able or willing to sell the property since Continental took possession.

The property is encumbered by a first mortgage dated November 19, 1976 in an original amount of $80,000.00 which is now held by two individuals, Ruth Miller and Jack Yampolsky. The first mortgage holders commenced an action in mortgage foreclosure in the Court of Common Pleas, Philadelphia County in May 1985. That action is still pending. The current unpaid balance of the first mortgage, through the end of December 1986, is approximately $78,400.00.[5]

Continental holds a second mortgage on the property dated May 9, 1980 in an original amount of $150,000.00. In April 1985, Continental filed a mortgage foreclosure against the debtor in state court and this foreclosure action is still pending. However, Continental also entered a judgment by confession against the debtor for $60,000.00 on July 15, 1986 and scheduled a sheriff's sale of the property for October 6, 1986. The October 1986 sale was postponed for one month by order of the Court of Common Pleas. The November sale was

---

hearing of establishing that the debtor does not have equity in the property.

4. There is no reasonable likelihood that the debtor will meet its burden at the final hearing of establishing that the property is necessary to an effective reorganization.

*In re 6200 Ridge, Inc.,* No. 86–05079G, slip op. at 11–12 (Bankr.E.D.Pa. December 18, 1986) (unpublished memorandum). *See* 11 U.S.C. § 362(e).

2. The holders of the first mortgage on the subject property have also moved for relief from stay. By agreement of the parties, that motion will be decided on the same record as the Continental motion.

3. For the same reason, I will grant relief to the holders of the first mortgage. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Bankr.Rules 9014 and 7052.

4. This finding is based on the testimony of John McLeaf, a Continental Vice President. Ironically, the debtor submitted evidence which suggests that the income produced monthly is somewhat lower. *See* Exhibit D–7, at 2–3. Since Continental is the entity actually collecting the rentals, I have credited the testimony of Mr. McLeaf.

5. There was testimony concerning this first mortgage that: the last payment was made in April 1985; that the unpaid principal balance at that time was $61,999.43; that the accrual of interest at the contract rate of 9% per year since the last payment brings the total unpaid balance through December 29, 1986 to $71,992.78; that attorney's fees and costs of $7,119.00 have been incurred; and that the total indebtedness is $79,285.98. In making these calculations, the first mortgagee added the unpaid interest each month to the principal balance before calculating the interest accruing during the following month, in effect "capitalizing" the interest each month. I am doubtful of the propriety of that method of calculating interest. In my finding of fact, I have calculated the interest from April 1985 through the end of December 1986 at 9% per year on the unpaid principal of $61,999.43. The difference of approximately $900.00 between the two conclusions is not material to the outcome of this case.

stayed by the filing of this bankruptcy case.

In order to determine the amount of the present indebtedness secured by the property, it is first necessary to review the terms of another transaction entered into by Continental, the debtor, and three other corporations controlled by Alvin Pearlman. On May 7, 1982, Continental entered into an agreement with Alvin Pearlman and four corporations of which he was president: Tracey Mechanical, Inc., Tracey Service Co., Inc., Fenerton Corp. and the debtor corporation. (Exhibit "D–4"). In this agreement, Fenerton purchased Continental's interest in Tracey Service's interest in the issued and outstanding stock of Tracey Mechanical. In connection with this sale, the parties acknowledged that the "aggregate indebtedness" of Tracey Mechanical, Tracey Service, the debtor and Mr. Pearlman to Continental as of April 1, 1982 was $748,329.84.

The May 7, 1982 agreement further provided, *inter alia,* that:

(a) the aggregate indebtedness of $748,329.84 would be the sale price for the stock to be acquired by Fenerton.

(b) the sales price would be paid in consecutive monthly installments, without interest, of $5,000.00 on May 1, 1982 through August 1, 1982 and $7,500.00 per month thereafter until paid in full.

(c) the debtor agreed that the mortgage granted against the debtor's real property (6200–06 Ridge Avenue) would be additional security for payment of the sales price.

Since the May 7, 1982 agreement was made, Continental has sold other property which also served as security for repayment of the aggregate indebtedness and

has received various other payments on the aggregate indebtedness. Presently, the unpaid balance of the aggregate indebtedness is approximately $155,000.00, plus an undetermined sum for reasonable attorney's fees. This indebtedness is secured by the mortgage on the property.

As a result of another transaction involving these related corporations, there is some additional security for the present indebtedness of $155,000.00. In October 1985, John Schmidt and Joseph B. Kopaczewski, two active principals in Tracey Mechanical, pledged to Continental certificates of deposit totaling $20,000.00 as further security for the aggregate indebtedness. In connection with the $20,000.00 pledge, Schmidt and Kopaczewski also received Continental's interest in eighty shares of the capital stock of Tracey Mechanical which had previously served as security for the aggregate indebtedness.[6]

Finally, the evidence demonstrated that the debtor has not paid the real estate taxes imposed by the City of Philadelphia for the period of 1984–86 inclusive. As of the final hearing, the unpaid taxes totalled approximately $13,000.00 and, all parties agree, are a first lien on the property.

## II.

■ As commonly occurs in relief from stay proceedings, much of the testimony at the initial and final hearings focused on the value of the property. The debtor contends that the value of the property is approximately $304,000.00. Taking into account the $20,000.00 pledge also securing the indebtedness, the debtor argues that there is equity in the property and that Continental's interest is adequately protected by a substantial equity cushion.[7] Conti-

6. At the preliminary hearing, the debtor contended that $20,000.00 was not fair consideration for the shares transferred from Continental to Schmidt and Kopaczewski, implying that the indebtedness claimed by Continental should be reduced to reflect the true value of the stock transferred. Based on the testimony of John Schmidt, I found that the $20,000.00 pledge was fair consideration in my preliminary decision. The debtor has not pressed this argument in the final hearing. The debtor simply requests that I

consider the $20,000.00 pledge in evaluating the existence or non-existence of any equity cushion in the property. *See* Debtor's Proposed Findings of Fact No. 28.

7. In addition, the record shows that there is a hazard insurance policy on the property in effect for the period March 1, 1986 through March 1, 1987 which was purchased by Continental. The policy was issued by the Lexington

nental submits that the fair market value of the property is $190,000.00. Thus, according to Continental, there is no equity in the property and its interest is not adequately protected.[8]

At the preliminary hearing, Continental offered the testimony of Robert Urbanski who was qualified as an expert real estate appraiser. Urbanski gave his opinion that the property has a fair market value of $190,000.00 and based his opinion on the "income approach." He determined fair rental values for the stores on the property, added fair rental value for the two billboards which are on the roof of the property and capitalized the sum of the rentals. He then subtracted the estimated cost of the work needed to repair the roof. To obtain his opinion as to fair rental values, Urbanski conducted a market survey; he visited the tenants and brokers in the area, asked them what they were paying for rent and, based on their answers, rendered an opinion as to fair rental value.

At the preliminary hearing, the debtors offered the testimony of Stephen Sendzik, a real estate broker with an office about one block from the subject property. He was qualified as an expert, but not without some difficulty. While he has done about 250 appraisals in his career, only twenty five were for commercial properties; and of those twenty five, only five were in writing. He offered his opinion that the value of the property is $375,000.00. He testified that the market approach could not be utilized because the property was unique. He further stated that the income

approach was not totally valid because the present rental values do not take into account the "gentrification" that he believes is taking place in the Manayunk area. Sendzik's opinion appeared to be based on what he believes rental values should be, the attractive location of the property and the market trend in the area.

In my decision following the preliminary hearing, I found that the fair market value of the property is $210,000.00 for the following reasons:

> While Continental's expert may not have sufficiently taken into account market trends and may have overestimated the necessary repair costs to the property, on the whole, his testimony was more persuasive than that offered by the debtor.

At the final hearing, the debtor offered the testimony of a second expert, George Helmetag. He testified that, based on the market approach, the value of the property, in its present condition, is between $285,000.00 and $300,000.00. He also attempted to determine the property's value using the income approach. With respect to this latter approach, he assumed that the corner store on the property would bring $18.00 per square foot and the other stores would bring $12.00 per square foot. Based upon the size of the stores, he stated that the rental value for all five was $62,100.00 per year minus approximately $19,000.00 in operating expenses. Using a 12% rate of return, Helmetag calculated a gross value of approximately $342,000.00 from which he subtracted $35,000.00 for necessary re-

---

Insurance Co. and contains a maximum coverage of $500,000.00.

8. Continental argues that the monthly income of $2,600.00 does not adequately protect its interest. Continental also argued at the preliminary hearing that the case should be dismissed pursuant to 11 U.S.C. §§ 305, 1112(b). In my initial decision, I denied Continental's request for dismissal because the section 305 and 1112(b) issues had been raised for the first time in the bank's memorandum of law rather than by motion and therefore were not properly before the court. See 11 U.S.C. §§ 305, 1112(b) (authorizing dismissal only "after notice and hearing"). See also In re Koopmans, 22 B.R.

395, 400–01 (Bankr.D.Utah 1982) (observing that motions to dismiss raise broad issues involving the future of the whole estate, require notice to all representative parties and, compared to motions for relief from stay, are less amenable to abbreviated, expedited hearings). At the final hearing, Continental did not seek dismissal but rather asserted that the same facts which would give rise to dismissal under sections 305 and 1112(b) constitute "cause" for relief from stay under section 362(d)(1). In light of my disposition of this case, I do not reach any issues under section 362(d)(1), including the propriety of Continental's argument regarding the meaning of "cause."

pairs to reach a final value of approximately $307,000.00.

Due to a number of weaknesses in Helmetag's testimony, I conclude that my initial findings, made after evaluating conflicting expert testimony, remain correct. Helmetag conceded that the comparable sales he used in reaching his opinion using the market approach may not have involved truly comparable properties. For example, he did not know whether the properties that were sold were in better condition, whether they were larger, whether they had been improved, whether they had more favorable leases, or whether the sales included a premium for goodwill. I note also that, in this respect, Helmetag's testimony conflicted with that of debtor's other expert who stated that because the property was unique, there are no comparable sales. For these reasons, his market analysis was unconvincing.

With respect to his analysis using the income approach, his testimony was less persuasive than that of Urbanski, Continental's expert. The difference between these experts was in the figure used as the fair rental value per square foot. Urbanski testified that he based his figures upon a survey. Helmetag testified that he simply used his own judgment as to what he thought rental values should be in the area. Since he provided no better foundation for his opinion on the issue of rental value, I must resolve the conflict in favor of Continental.

For these reasons, I find that the fair market value of the property is $210,000.00.

**9.** Total indebtedness is as follows:

| | | |
|---|---|---|
| (a) | first mortgage | — $ 78,400.00 |
| (b) | second mortgage | — $155,000.00 |
| (c) | tax lien | — $ 13,000.00 |
| | Total | $246,400.00 |

**10.** The debtor assumes that the loan pledge made by the two individuals totalling $20,000.00 should be considered in determining "equity" under § 362(d)(2). Clearly, the pledge is relevant for adequate protection purposes under

## III.

11 U.S.C. § 362(d)(2) provides that the court shall grant relief from the automatic stay

with respect to a stay of an act against property ... if

(A) the debtor does not have equity in property; and

(B) such property is not necessary to an effective reorganization.

The party seeking relief has the burden of proof on the issue of the debtors equity in the property and the party opposing relief has the burden of proof on all other issues in proceedings for relief from the automatic stay. 11 U.S.C. § 362(g).

For purposes of section 362(d)(2)(A), the concept of equity refers to the "difference between the property value and the total amount of liens against it." *In re Liona Corp.*, 68 B.R. 761, 766 (Bankr.E.D. Pa.1987), *quoting In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 901 (Bankr.D. Mass.1985); *accord, In Mellor*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984).

In this case, the unpaid balance of the two mortgages and the tax lien totals approximately $246,000.00 [9] while the fair market value of the property is $210,000.00. Even considering the $20,000.00 pledge, the debtor lacks equity in the real property.[10]

Since there is no equity in the property, I must decide if the property is necessary to an effective reorganization. Property in which the debtor has no equity is necessary to an effective reorganization "whenever it is necessary, either in the operation of the business or in a plan, to further the interests of the estate through

§ 362(d)(1). *See Commonwealth of Pennsylvania School Employees Retirement Fund v. Roane*, 14 B.R. 542 (E.D.Pa.1981); *In re Diaconx Corp.*, 69 B.R. 333, 338 (Bankr.E.D.Pa.1987), *appeal docketed* (E.D.Pa.) However, section 362(d)(2) serves a purpose different from (d)(1) and may well make the pledge irrelevant for purposes of computing equity. Given my conclusion as to the property's fair market value at the time of the hearing, I need not reach this issue.

rehabilitation or liquidation." *In re Koopmans*, 22 B.R. 395, 407 (Bankr.D.Utah 1982). Put another way, property is necessary if it "will contribute" to a plan of reorganization. *In re Jug End in the Berkshires, Inc.*, 46 B.R. at 902. That plan may be a liquidation plan as permitted by 11 U.S.C. § 1123(b)(4).

Most courts which have considered the issue have also held that the reference to an "effective" reorganization in 11 U.S.C. § 362(d)(2)(B) requires that relief from stay be granted if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations. *E.g., In re Albany Partners, Ltd.*, 749 F.2d 670, 673 n. 7 (11th Cir.1984); *In re Jug End in the Berkshires, Inc.; Matter of Davenport*, 34 B.R. 460 (Bankr.M.D.Fla.1983); *In re Garden Motor Lodge and Restaurant, Inc.*, 34 B.R. 138 (Bankr.D.Vt.1983); *In re Mikole Developers, Inc.*, 14 B.R. 524 (Bankr.E.D.Pa.1981); *In re Dublin Properties*, 12 B.R. 77 (Bankr.E.D.Pa.1981); *Matter of Terra Mar Associates*, 3 B.R. 462 (Bankr.D.Conn.1980); *accord*, 2 Collier on Bankruptcy ¶ 362.07[2] (15th ed. 1986). *But see In re Sunstone Ridge Associates*, 51 B.R. 560 (D.Utah 1985).

■ Determinations that property is not necessary to an effective reorganization due to the lack of feasibility should not be favored in the early stages of a bankruptcy. "No one knows whether the debtor can survive until he has done what Chapter 11 affords him occasion to do: clean house and work out a plan." *In re Koopmans*, 22 B.R. at 404 n. 17. For this reason, uncertainties should be resolved in the debtor's favor during the period in which the debtor is entitled to file a plan of reorganization. *See Dore & Associates Contracting, Inc v. American Druggists' Insurance Co.*, 54 B.R. 353, 359 (Bankr.W. D.Wisc.1985). At the same time, however, the debtor is obliged to make some showing that a reorganization is possible. As one court stated:

> The debtor need not show that it has actually proposed a plan which is acceptable to its creditors.... The debtor need only demonstrate a reasonable probability that it will be able to propose a plan for a successful reorganization within a reasonable time.... A reasonable probability cannot be grounded solely on speculation, however, and a "mere financial pipe dream" is insufficient to meet the requirements of § 362(d)(2). *In re Dublin Properties*, 12 B.R. 77, 81 (Bankr.E.D.Pa.1981).

*In re Jug End in the Berkshires, Inc.*, 46 B.R. at 902 (footnote and some citations omitted).

■ In this case, the debtor has not met its burden of showing that there is a reasonable likelihood of a successful reorganization. There is no evidence that the debtor has any prospect of rehabilitating itself. The debtor is a one-asset corporation and has been out of possession of its one asset for some time. It is not presently operating as a business and presented no evidence of intent or ability to do so in the future. Since the former principal of the debtor is deceased, his heirs are now in control; but they seemed to know very little about the debtor's property, or even their role in handling the property, and presented no program for the debtor's future.

Nor is there any reasonable prospect that the debtor's sole asset will provide a basis for proposing a liquidating plan, *see* 11 U.S.C. § 1123(b)(4), as the debtor suggests. *See* Debtor's Memorandum of Law at 7. I recognize that, depending upon the facts of the case, property in which the debtor lacks equity may be beneficial to the estate, even in a liquidating plan.

> The property may be important to the liquidation of other property, as for example a warehouse or refrigerator which, although overencumbered, may be needed to store inventory or groceries pending sale.... [W]hen sold as a package, [the property] may bring a better price for other assets.... Or the property may be sold for the direct benefit of junior lienors and the indirect benefit of

unsecured creditors.... [I]t ... may deserve the protection of the stay because, in order to continue operations, its value has been appropriated to supply adequate protection for others or pledged to secure postpetition credit.

*In re Koopmans,* 22 B.R. at 407; *accord,* 2 Collier ¶ 362.07[2], at 362–56 n. 15a.

■ However, where the debtor is a single asset corporation which is not conducting any business, there is no basis to conclude that property lacking equity has any value to the estate in a liquidating plan.[11] At bottom, the debtor's theory why the property is necessary for reorganization in this case is premised on a belief that the fair market value of the property exceeds the encumbrances, a question of fact that I have resolved against the debtor.[12]

Moreover, in light of the opposition of the two secured creditors, both of whom are seeking relief from the automatic stay, I have serious doubts about the debtor's ability to propose a confirmable plan under 11 U.S.C. § 1129.[13]

In short, the debtor has not come forward with sufficient evidence to demonstrate that its one asset is necessary for reorganization, even under the liberal standard to which it is entitled at this stage of the case. Its mere assertion that the property is essential to the debtor's reorganization and that it should be given a reasonable opportunity to present a plan is not sufficient to establish the existence of a reasonable prospect of reorganization. *See In re Gelice,* 7 B.R. 469, 472–73 (Bankr.E.D.Pa.1980). *Cf. In re Dublin Properties,* 12 B.R. at 80–81 (debtors burden met by evidence showing amount of work needed to complete a construction project, the value of the project and the availability of financing to complete the project).

## IV.

For the reasons set forth above, an order will be entered granting Continental relief from the automatic stay.

**11.** The legislative history of 11 U.S.C. § 362(d)(2) might be read to state that property is never necessary to an effective reorganization in one asset/real property cases in which there is no equity—at least where liquidation is contemplated. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 5, 53 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5791, 5839.

**12.** The debtor suggests that a liquidating plan is preferable because if the property is subject to a forced sale, the full value of the property will not be realized. However, since there is no equity, the only potential harm would be to the most junior lien holder, Continental, which is the entity which seeks relief herein. As Collier points out, even in the absence of equity, an orderly disposition of the property may be crucial to a successful reorganization by precluding the creation of additional unsecured claims arising from the foreclosure of senior interests. 2 Collier ¶ 362.07[2], at 362–56 n. 15a. However, where, as in this case, the debtor has no prospect of rehabilitation and resuming business operations, it is difficult to see why the possible existence of deficiency claims will have any impact on the debtor. Moreover, this is not a case where the debtor has shown that a reasonable delay will allow equity to be formed (while secured creditors are simultaneously adequately protected from any harm caused by the delay).

**13.** The debtors listed one unsecured creditor, the City of Philadelphia, which is owed an indeterminate amount for unpaid water and sewer charges. This creditor may be secured or unsecured depending upon the actions taken by the city prepetition. *See* 53 P.S. § 7106(b) (in city of the first class, municipal claim shall be a lien "only after the lien has been docketed by the prothonotary"); *In re Adams,* 40 B.R. 545, 549 (E.D.Pa.1984); It is quite possible that Continental, which is operating the property, has paid the city for water and sewer usage, for otherwise, the tenants might be without water service. Thus, it is possible that there are no unsecured creditors in this bankruptcy case.