**In re COLONIAL CENTER, INC., Kirsch Enterprises, Inc., Debtors.**

**Bankruptcy Nos. 92–15613F, 92–15874F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 29, 1993.

Michael R. Lastowski, Robert M. Greenbaum, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Resolution Trust Corp.

William Lashner, Lashner & Lashner, Philadelphia, PA, for debtors.

Frederic J. Baker, Senior Asst. U.S. Trustee, Philadelphia, PA.

## MEMORANDUM

BRUCE I. FOX, Bankruptcy Judge.

Three motions in these two distinct (but related) chapter 11 bankruptcy cases are before me on a consolidated record. First, the Resolution Trust Corporation (RTC) in its capacity as receiver for Atlantic Financial Savings, F.A., seeks relief from the automatic stay to resume foreclosure on two pieces of real property owned by debtor Kirsch Enterprises, Inc.[1] The other two motions are brought by the debtors, Kirsch Enterprises, Inc. and Colonial Center, Inc. respectively. Each debtor has filed a motion requesting that it receive and use postpetition rents from three commercial properties. As the RTC has a security interest in these rents, the debtors are seeking to use cash collateral pursuant to 11 U.S.C. § 363(e).

The facts surrounding these motions are made a little more complicated than usual by the terms of the underlying loan agreement and the number of parties and properties involved; but the facts and legal issues for the three motions are related and the parties were correct in requesting that the hearings be concluded with one record. I shall summarize (but unfortunately not simplify) the relevant facts.

### I.

#### A.

Colonial Center, Inc. filed a voluntary petition in bankruptcy under chapter 11 on September 16, 1992. This debtor is a corporation whose stock is owned 60% by Mr. Alan Kirsch and 40% by Kirsch Enterprises, Inc. On September 25, 1992, Kirsch Enterprises, Inc. filed its own chapter 11 petition. Its stock is owned 52% by Mr. Kirsch and 48% by the Christian Kirsch Trust.[2] Christian Kirsch is Alan Kirsch's father.

In February and July 1989, Alan Kirsch borrowed a total of $2.2 million from Atlantic Financial Federal. Ultimately the loan was guaranteed by suretyship agreements entered into by Kirsch Enterprises and Colonial Center. As collateral for this loan,

---

1. The RTC does not suggest that the bankruptcy stay does not apply to it as a receiver of an insolvent savings and loan institution. Therefore, I do not consider this issue. *See generally In re Colonial Realty Corp.*, 980 F.2d 125 (2d Cir.1992).

2. Alan Kirsch at first testified that he held 60% of the stock of Kirsch Enterprises, Inc. and the Trust held 40%. Later he used the figures quoted in the text. For purposes of these motions, this discrepancy is irrelevant.

Kirsch, Kirsch Enterprises and Colonial Center provided mortgages on four pieces of real estate: 225 Bala Avenue, Bala Cynwyd, Pennsylvania; 207–215 Bala Avenue, Bala Cynwyd, Pennsylvania; 146 Montgomery Avenue, Bala Cynwyd, Pennsylvania (the "Mony Building"); and 138–144 Montgomery Avenue, Bala Cynwyd, Pennsylvania (the "Colonial shopping center").

These four properties may be described as follows. The property located at 225 Bala Avenue is owned by Alan Kirsch and his wife Elizabeth. On this property is a two story building; the first floor (which is much larger than the second floor) is leased to Kirsch Chevrolet, Inc. Mr. Kirsch is the only shareholder of Kirsch Chevrolet. Kirsch Chevrolet subleases the first floor of the building (at a sum far in excess of the lease payment due from Kirsch Chevrolet) to Don Rosen Imports Company for use as a new car showroom. The second floor of the building is leased by an entity known as Hearing Conservation Control, Inc.

The realty at 207–215 Bala Avenue is a 74,000 square foot parcel upon which sits a small service garage operated by Don Rosen BMW, with the balance of the realty used to store automobiles. This property is owned by Kirsch Enterprises and leased to Kirsch Chevrolet, which in turn subleases at a substantial profit to Don Rosen Imports Company.

The real estate located at 146 Montgomery Avenue (the "Mony Building") is a three story office building. It is owned by Kirsch Enterprises, Inc. and is fully occupied.[3]

Finally, the realty at 138–144 Montgomery Avenue is the site of a strip shopping center. At one point, the owner of this realty was Colonial Center, Inc. However, in September 1982, Colonial Center transferred its interest in the realty to the Montgomery County Industrial Development Authority ("MCIDA"). MCIDA in turn entered into an installment sales agreement with Mr. Kirsch concerning this realty.

MCIDA then assigned its interest in the installment sales agreement to First Federal Savings and Loan (now known as Firstrust Savings Bank) as collateral for a loan made to MCIDA (which in turn lent the funds to Mr. Kirsch).

At present, the legal owner of the realty is MCIDA, with the beneficial owner being Mr. Kirsch. Mr. Kirsch argues that the "true" owner of the beneficial interest is Colonial Center, Inc. (the original owner). And, after the bankruptcy petition of Colonial Center was filed, Kirsch assigned his beneficial interest to this debtor. However, the agreement among Kirsch, MCIDA and Firstrust precludes any assignment of the beneficial interest without the consent of MCIDA and Firstrust. Neither has consented to date.

The RTC's involvement in these bankruptcies stems from the takeover of Atlantic Financial Federal by the federal Office of Thrift Supervision. Certain assets (including the loans and mortgages relevant to this dispute) were transferred to a new entity, Atlantic Financial Savings, F.A. ("AFS"), with the RTC appointed receiver for AFS. As of November 1992, the RTC asserts (and the debtors have accepted for purposes of these disputes) that Kirsch owed approximately $2,710,000.00 to AFS.

### B.

The lien structure of the four real properties mentioned above is as complicated as their ownership. The parties agree that Firstrust holds a first mortgage on the Colonial shopping center—138–144 Montgomery Avenue—in the present amount of $457,000.00. Main Line Federal (for purposes of these motions) was agreed to hold a first mortgage on 207–215 Bala Avenue in the amount of $184,000.00.

The RTC (or, more properly, AFS) obligation of $2.71 million is secured by four mortgages. As receiver, RTC holds a first mortgage on 146 Montgomery Avenue, a second mortgage on 207–215 Bala Avenue, a second mortgage on 138–144 Montgom-

---

**3.** One of the tenants in the building is Prime Realty Group. From the testimony, it appears that this tenant pays no rent in return for its rendering services to the lessor.

ery Avenue, and a first mortgage on 225 Bala Avenue.

In addition, Mr. Kirsch owes $1,315,-000.00 to United Valley Bank ("UVB"). To secure payment of this sum, UVB took third position mortgages on the four properties mentioned above. In addition, it holds a second mortgage position on another property located at 319–325 Lancaster Avenue, Bala Cynwyd, Pennsylvania. The Lancaster Avenue property is owned by Alan Kirsch alone and is rented to an entity operating a Ford Motor Company new car dealership. The first mortgage on the realty is held by First Bank of Philadelphia in the amount of $864,000.00.

Finally, various creditors hold judgments against Mr. and Mrs. Kirsch. By virtue of state law, entry of these judgments creates liens upon all realty owned by these individuals in the county in which the judgment is recorded. *Accord* 42 Pa.C.S.A. § 4303; *Matter of Nelson Co.*, 959 F.2d 1260, 1264 (3d Cir.1992). For purposes of these disputes, those judgment liens are attached to 225 Bala Avenue, 319–325 Lancaster Avenue, and possibly 138–144 Montgomery Avenue. Although Mr. Kirsch testified that some of the recorded judgment amounts may not be accurate at present, the debtors have assumed in their posthearing memorandum, as will I, that most of the recorded amounts are sufficiently precise to be considered liens in determining these contested matters. I will therefore accept that these liens total approximately $370,000.00, based largely upon Mr. Kirsch's testimony.[4]

### C.

The parties differed as to their valuations of the various properties. The RTC offered an expert witness who appraised the four properties upon which it (as receiver for AFS) holds a mortgage. The debtor offered the testimony of Mr. Kirsch as to the same four properties plus the Lancaster Avenue property. *See generally U.S. v. 68.94 Acres of Land in Kent County*, 918 F.2d 389, 397 (3d Cir.1990) ("The Federal Rules of Evidence generally permit landowners to give opinion evidence as to the value of their land due to the special knowledge of property which is presumed to arise out of ownership"). As is typical of these types of motions, the values suggested by the creditor were less than those suggested by the debtor.[5]

Mr. Kirsch's methodology of valuation was the same for all five properties. He opined as to the annual gross rental income, subtracted his estimate of the annual operating expenses, and then capitalized the net rental income by a factor of 10%.[6]

The RTC's expert appraiser, Ms. Maureen Mastroieni, used a more elaborate approach. She projected net income over five years and discounted that income flow to present value and then added the residual value of the realty after five years (also discounted to present value) by an income capitalization approach. She also sought, when possible, to consider comparable sales. (Though, generally, income producing commercial real is valued by considering income rather than sales of other commercial property.)

I have reviewed the valuation evidence offered and I am reluctant to accept Mr. Kirsch's opinion, because I was unpersuaded as to the accuracy of his approximations of net income.[7] Indeed, his testimony on values differed (and was generally higher) from that disclosed by him in the debtors' bankruptcy schedules. Exs. RTC–14, RTC–15. Overall, Ms. Mastroieni's analy-

---

4. The debtors' posthearing memorandum arrives at the figure of $380,000.00, but I believe the correct total is $368,000.00. I also note that Mr. Kirsch stated that the largest judgment creditor had additional collateral—distinct from the parcels of realty mentioned above—worth $125,-000.00. I have not considered this additional collateral in my analysis as it would not affect the outcome.

5. At confirmation hearings, the valuation positions of the parties may be reversed. L. King, 2 *Collier on Bankruptcy,* ¶ 362.07[2] at 362–70 (15th ed. 1992). I shall render conclusions as to value for purposes of the present disputes only.

6. In other words, he multiplied the annual net income by 10.

7. Ms. Mastroieni found Mr. Kirsch's operating expense data "unreliable". Ex. RTC–11, at 69.

ses are more persuasive, except for the Bala Avenue properties.

■ In essence, Ms. Mastroieni used a high discount and terminal capitalization rate on the Bala Avenue real estate because she did not view the use of the property by Don Rosen Import Company as its highest and best use.[8] That is, she considered car dealerships to be a risky venture in the present economic marketplace. She also concluded that the Don Rosen lease was less than full market price. Both conclusions may be accurate, but when used in her discounted income approach they combine to undervalue the property.

The appraiser assumed that future net income on the Bala Avenue properties would be generated from the Don Rosen leases. Ex. RTC–11, at 69. Then she also used a 15% discount rate because this lessee operates a riskier than normal business. Insofar as the value of the property is concerned, the soundness of the tenant's business operation is material to the likelihood that the tenant will not pay rent.

It is sensible to me that the value of an income stream would be affected by the likelihood of the income being received. But here, if this particular tenant does not pay rent (because of insufficient business), the lease will be terminated. Thus, the lease to Don Rosen has a higher than normal probability of termination. But this lease has been determined by the appraiser to be below market rates. Accordingly, the value of the property should be greater (not less) when a tenant with a below market lease has an appreciable risk of default

than if there was little probability that this unattractive lease would be breached.

The appraiser failed to consider this aspect. In fact, she unpersuasively discounted the value of the realty twice: once for the existence of the below market lease; and again because of the danger that the tenant will default. Accordingly, her valuation of the Bala Avenue properties was, in my judgment, too low.

In summary fashion, and for purposes of these disputes only, I assign the following values to the various properties: the properties located at 207–215 and 225 Bala Avenue have a combined value of $2.1 million[9]; of that combined sum, the value of 207–215 Bala Avenue only is $441,000.00; 146 Montgomery Avenue has a value of $1.4 million; 138–144 Montgomery Avenue has a value of $1.9 million; and, discounting Mr. Kirsch's testimony, I shall value 319–325 Lancaster Avenue at $1.4 million.[10]

### D.

Finally, I note that prior to the bankruptcy filing of both debtors, the RTC made demand of tenants and began to receive the rents from the tenants of the Bala Avenue properties as well as from the tenants of the two Montgomery Avenue properties. Such recovery of the rents was consistent with Pennsylvania law, and the debtors do not suggest otherwise. *See generally In re Wynnewood House Associates*, 121 B.R. 716 (Bankr.E.D.Pa.1990).

Since these two bankruptcy cases began, the RTC has been collecting rents from tenants and paying for needed maintenance, expenses and repairs. Mr. Kirsch does not believe that the RTC (or its

---

**8.** Their combined appraised value, as is, was $1.53 million. Their value generating their highest possible income—or their value if operated at their "highest and best use"—was estimated at $2.25 to $2.65 million. Ex. RTC–11 at 56, 85.

**9.** I shall make the same assumption as the RTC's appraiser: that the lease of the Bala Avenue properties in favor of Kirsch Chevrolet would not be binding upon any hypothetical purchaser of the realties. Further, Ms. Mastroieni concluded that it was difficult to value the two Bala Avenue properties independently.

She ultimately assigned a value to each nonetheless. The value of 207–215 Bala was 21% of the total value. I have used the same ratio, though I conclude that her total value is understated for the reasons mentioned above.

**10.** As to 146 Montgomery Avenue, Mr. Kirsch valued the property at $1.7 million but the RTC's appraiser thought it worth only $1.4 million. Mr. Kirsch thought the Lancaster Avenue property was also worth $1.7 million. I am assuming his overstatement of values is roughly consistent by assigning a $1.4 million value to this property.

agents) have been fully meeting its responsibilities in that regard. The RTC argues otherwise.

The RTC seized the rents prepetition because Mr. Kirsch ceased tendering monthly loan payments on or about January 1990. Mr. Kirsch testified that he ceased tendering payments because he was attempting to persuade the RTC to offer him a compromise loan payoff figure. There was no explanation provided by Mr. Kirsch why the RTC should compromise its loan claim; nor did he supply any viable justification for withholding monthly mortgage payments until the RTC did so.

Mr. Kirsch also was unable to explain the disposition of the net rents he received between January 1990 and September 1992—when the rents began to be paid directly to the mortgagee. From his testimony, it is clear that there were significant net rentals paid to him during this period. Further, he testified that he acted on the debtors' behalf in collecting rentals from their properties. (Mr. Kirsch maintains that rentals from the Colonial shopping center belong to Colonial Center, Inc.)

To the extent that net rentals were generated by properties which belonged to the debtors, and upon leases for which the debtors were the lessors, those rental proceeds, if not paid to secured creditors, should be part of the debtors' estates. Although no mortgage payments were being tendered to the RTC for almost two years, the debtors' schedules disclose only nominal cash on hand at the time of the bankruptcy filing. For example, Kirsch Enterprises, Inc. (which clearly owns two properties) scheduled only $142.86 in cash.

Mr. Kirsch was unclear as to the amount he charged the corporate debtors for his services in acting on their behalf. The

RTC contends that the sums charged were very substantial—in excess of $150,000.00 per annum—but Mr. Kirsch did not concur in this figure. Given the lack of explanation for the debtors' failure to accumulate cash after the cessation of mortgage payments to the RTC, it is likely that the funds were distributed to Mr. Kirsch.

### E.

The debtor has proposed a reorganization plan which, initially, called for Mr. Kirsch to obtain refinancing on the four properties serving as collateral for the RTC loan. He testified as to his willingness to include the Lancaster Avenue property in the refinancing package, if necessary, to repay all creditors of the debtor corporations. The evidence disclosed, however, that Mr. Kirsch has made prior efforts to refinance for more than one year without success. He presently has no loan applications pending; he has no loan commitments for refinancing outstanding.

At the hearing on these motions, Mr. Kirsch also testified as to his willingness to sell the four or five properties if such a sale were necessary to reorganize. He offered no specifics for his sale proposal— that is, he offered no deadlines for sale, no brokerage agreements, nor any initial asking prices for the properties. He further testified that offers may have been made on one or more of the properties, but no such offers have been made in writing.

### II.

### A.

The RTC seeks relief from the automatic stay only as to the two properties owned by Kirsch Enterprises: 146 Montgomery Avenue, and 207–215 Bala Avenue. Furthermore, it relies solely upon section 362(d)(2)[11] as grounds for relief. For the

---

11. This statutory provision states:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

\* \* \* \* \* \*

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization.

following reasons I conclude that the automatic stay should not be lifted.

■ As a general principle, whether to modify, condition, or annul the bankruptcy stay under section 362(d) is committed to bankruptcy court discretion, *see Matter of Holtkamp*, 669 F.2d 505 (7th Cir.1982); *In re Shariyf*, 68 B.R. 604 (E.D.Pa.1986), and is to be determined by examining the totality of the circumstances. *Accord Matter of Baptist Medical Center of New York, Inc.*, 52 B.R. 417, 425 (E.D.N.Y.1985), *aff'd*, 781 F.2d 973 (2d Cir.1986). Indeed, even if both elements of section 362(d)(2) have been proven, some courts have suggested that a bankruptcy court still has discretion to deny relief from the stay if the interest of the secured creditor is otherwise adequately protected. *Accord In re Markowitz Bldg. Co.*, 84 B.R. 484, 487 (Bankr. N.D.Ohio 1988); *In re Saint Peter's School*, 16 B.R. 404, 408 (Bankr.S.D.N.Y. 1982). *See also In re New Era Co.*, 125 B.R. 725, 729 (S.D.N.Y.1991); *In re East– West Associates*, 106 B.R. 767, 774 (S.D.N.Y.1989); Landers, 1 *Norton Bankruptcy Law and Practice*, § 20.27 at 65 (1992). *But see In re Faires*, 34 B.R. 549, 553 (Bankr.W.D.Wash.1983).[12]

■ Relief from the bankruptcy stay under section 362(d)(2) requires a two part analysis. Section 362(d)(2)(A) requires a showing that there is no "equity" in the collateral—that the value of the collateral is less than the sum total of all of its liens. *See, e.g., In re Liona Corp., N.V.*, 68 B.R. 761, 766 (Bankr.E.D.Pa.1987); *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892,

901 (Bankr.D.Mass.1985). The secured creditor has the burden of demonstrating lack of equity. 11 U.S.C. § 362(g)(1). *In re Liona Corp., N.V.* If there is no equity, then the debtor has the burden of demonstrating that the collateral is necessary for a plan of reorganization "that is in prospect" within a reasonable time. 11 U.S.C. §§ 362(d)(2)(B), 362(g)(2). *United Sav. Assoc. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Unless the secured creditor demonstrates a lack of equity, a court does not reach the issue under section 362(d)(2)(B). *Accord, e.g., In re Kaplan*, 94 B.R. 620, 621 (Bankr. W.D.Mo.1989); *Matter of Cardell*, 88 B.R. 627, 631–32 (Bankr.D.N.J.1988); *In re Skipworth*, 69 B.R. 526, 527 (Bankr. E.D.Pa.1987). This follows because, to a certain extent, Congress implicitly assumed in section 362(d)(2) that if the collateral has measurable value to the estate in excess of lien claims, it can be liquidated and its proceeds used as part of a liquidating plan of reorganization. Measurable equity therefore means that the secured property is likely to be needed in a plan of reorganization, and such reorganization is possible.

■ Equity (defined differently) also has significance to the issues raised by section 362(d)(1). This subsection calls for relief from the bankruptcy stay when the movant demonstrates "cause" for relief, *see generally In re Ward*, 837 F.2d 124, 128 (3d Cir.1988); *In re Skipworth*, and the debtor does not demonstrate that the interests of the movant are "adequately protected." 11

---

**12.** Although section 362(d)(2) states that a court "shall" act if the provisions of that subsection are established, the action that need be taken is to "terminate[ ], annul[ ], modify[ ], or condition[ ]" the automatic stay.

Generally, if there is no equity in the collateral and the collateral is unnecessary to a reorganization, a court should "terminate" or end the stay and permit the secured creditor to exercise its nonbankruptcy law right to foreclose and obtain possession of the collateral. In an unusual circumstance, where the secured interest of the creditor is clearly adequately protected, even though the elements of subsection 362(d)(2) have been demonstrated, a court may "condition" the continuation of the bankruptcy stay upon certain actions by the debtor includ-

ing actions designed to insure that such adequate protection remains in place. *See Matter of East–West Associates*, 106 B.R. at 774:

By the strict language of the statute, the Bankruptcy Court may, upon finding that the elements of Section 362(d)(2) are met, condition the stay, just as the stay maybe conditioned under Section 362(d)(1). Thus, some courts have held that, even if the grounds for relief under subsection (d)(2) are met, a creditor is not automatically entitled to have the stay lifted if the debtor is able to proved that the creditor is adequately protected under subsection (d)(1).

*Accord* Landers, 1 *Norton Bankruptcy Law and Practice*, § 20.27 at 65 (1992).

U.S.C. § 362(g)(2). *See, e.g., In re Skipworth; In re Liona Corp., N.V.* If the value of the collateral is substantially greater than the lien held by the moving secured creditor and all liens with priority over that held by the movant, then this substantial "equity cushion" can provide adequate protection to the secured interest of a mortgagee. *See, e.g., In re Mellor,* 734 F.2d 1396, 1400 (9th Cir.1984); *Pennsylvania State Employees' Retirement Fund v. Roane,* 14 B.R. 542 (E.D.Pa.1981); *In re Rorie,* 98 B.R. 215 (Bankr.E.D.Pa. 1989); *In re McCombs Properties VI, Ltd.,* 88 B.R. 261 (Bankr.C.D.Cal.1988). *See generally In re Liona Corp., N.V.*

 Unlike equity under section 362(d)(2), which is a function of the value of the collateral and the total of the liens against it, equity under section 362(d)(1) considers the lien position of the movant and the likelihood that its secured interest would be diminished were the stay not lifted. If the movant lienholder bears little risk of nonpayment if the stay were to continue because the value of the collateral is significantly in excess of its lien, and this cushion is not eroding too rapidly, the secured interest of this creditor is adequately protected within the meaning of sections 361 and 362. Obviously, the two equity measurements (but not their purposes) under subsections 362(d)(1) and (d)(2) become identical when the secured creditor seeking relief from the automatic stay holds the only lien or holds the lien with the lowest priority.

### B.

The debtor argues in its posthearing memorandum—and the RTC implicitly agrees, for it does not seek relief under section 362(d)(1)—that the RTC holds a substantial equity cushion which adequately protects its secured claim under section 362(d)(1). The RTC mortgage debt against Mr. Kirsch, guaranteed by mortgages on four pieces of property, is $2.71 million. There are two mortgage liens in a priority position on two of the properties: those held by Main Line Federal and by Firstrust

Bank. These two prior liens aggregate approximately $641,000.00.

Thus, the RTC lien and the two prior liens total $3,351,000.00. But the four properties have a combined value—as I concluded above—of $5.4 million, yielding an "equity cushion" of 60%. *See In re Rorie,* 98 B.R. at 221 & n. 16. With such a large cushion, clearly, the RTC secured claim runs little risk of being unpaid if its right to foreclose upon these properties is postponed for a relatively short time so that the debtor may propose and seek approval of a reorganization plan.

But the four properties are not all owned by the debtor, Kirsch Enterprises. Indeed, they are not all owned by debtors in bankruptcy at all, since Mr. and Mrs. Kirsch own at least one if not two of the four properties. The RTC seizes upon this fact and contends as follows. The equity referred to in section 362(d)(2)(A) is concerned only with the debtor's property, not with the property of nondebtors (or of different debtors in separate bankruptcy cases). Furthermore, the issue of equity under subsection (d)(2) concerns all liens against the property, not just the movant's lien and senior liens. Thus, focusing solely upon the properties of Kirsch Enterprises and considering all liens against those properties, the RTC proffers this analysis.

The two Kirsch Enterprises properties have a combined value of $1,841,000.00 (using my valuations outlined above). Total liens held by Main Line Federal, the RTC and United Valley Bank equal $4,209,000.00. According to the RTC, there is no equity in these properties under section 362(d)(2)(A). (RTC posthearing memorandum at 3.)

Obviously, one reaches this result only by not considering the other collateral securing the RTC mortgage loan and the UVB loan to Mr. Kirsch, and by ascribing the entire RTC and UVB mortgage debt to the two debtor properties rather than apportioning the debt in some manner to the debtor's properties and the nondebtor properties. Not surprisingly, the debtor advocates consideration of all collateral available to the secured creditor, regardless of

whether that collateral is property of the estate. The question posed by the parties is whether the RTC's analysis is correct on the facts of this dispute.

### III.

The only two reported decisions to squarely address this question reached opposite conclusions. *Compare In re New Era Co.*, 125 B.R. at 729 ("section 362(d)(2) only demands an analysis of the debtor's equity in the property") *with Matter of Cardell*, 88 B.R. at 631–32 ("the value of all collateral should be considered" under section 362(d)(2)(A)). One leading commentator agrees with the latter decision. *See* L. King, 2 *Collier on Bankruptcy*, ¶ 362.-07[2] (15th ed. 1992) ("The 'property' need not be property of the estate"). Neither court provided extensive reasoning to explain its position.

In *In re 6200 Ridge, Inc.*, 69 B.R. 837, 842 n. 10 (Bankr.E.D.Pa.1987), I reached the conclusion that an equity cushion under section 362(d)(1) for purposes of adequate protection would include all collateral available to the secured creditor.[13] I did not then determine whether the issue of equity under section 362(d)(2) should yield a different result, but noted that the purposes of the equity issue in the two subsections of 362(d) were somewhat distinct. *Id.*

■ The measurement of equity in section 362(d), just like the measurement of value under section 506(a), should depend upon the circumstances and the purpose behind the valuation of property. Obviously, if a debtor's estate consists of inventory encumbered by a lien, a court should consider the value of the entire inventory—and not one or two pieces—in determining whether equity exists for purposes of lifting the bankruptcy stay in favor of a creditor with a security interest in all of the inventory.

Similarly, in the context of section 506(a) and (d) of the Code, it would be inappropriate to "strip down" a mortgage lien which is undersecured as to the debtor's property when the parties agreed that the mortgagee could also recover from nonestate property, the value of which, when combined with the debtor's property, far exceeds the value of the loan. *In re Mihalko*, 87 B.R. 357, 363 (Bankr.E.D.Pa.1988); *In re Panas*, 68 B.R. 421 (Bankr.E.D.Pa.1986).

■ As noted in *Stewart v. Gurley*, 745 F.2d 1194, 1196 (9th Cir.1984), section 362(d)(2) was designed to grant relief to a secured creditor when the debtor has no viable prospects for reorganization which make use of the property and its sale would not yield proceeds for the debtor's estate. In such an instance, continuation of the bankruptcy stay benefits only junior lienholders—who are free to bid at a foreclosure sale—and not the debtor's estate. Construing section 362(d)(2)(A) with this purpose, I conclude that the elements of section 362(d)(2) have not been demonstrated in this instance.

■ In this dispute, the secured creditor seeking relief from the stay loaned money to a nondebtor, with the loan guaranteed by the two debtors. The guarantees with additional collateral reflected the intent of the lender to be able to reach all the properties in the event of default. The mortgage liens designed to insure repayment do not designate any particular order of foreclosure upon the properties, nor do they condition foreclosure of the estate or nonestate properties upon some event other than default. The nondebtor is presently a principal of the debtors and proposes to offer all of the collateral properties (plus one additional property) or their proceeds as part of the debtors' reorganization. Therefore, there is no difficulty in the cred-

---

**13.** In closing arguments, I raised this example with RTC's counsel. If the RTC held a secured claim of $100,000.00 with the loan collateral being real estate owned by the debtor—worth only $75,000.00—and $1,000,000.00 in cash owned by a nondebtor guarantor—with these funds deposited with the RTC bank—should the RTC be granted relief from the stay under § 362(d)(1)? The intuitive answer is no. One should not ignore the existence of cash, both easily recoverable by the secured creditor and far in excess of the lien claim. The RTC suggests, though, that the creditor should obtain relief in such an instance by virtue of section 362(d)(2). But that result is also not intuitive.

itor's ability to reach all the collateral under reorganization. *Compare In re New Era Co.*, 125 B.R. at 729 (the ownership of the additional collateral was unclear and the property was subject to an interpleader action); *In re Diaconx Corp.*, 69 B.R. 333, 339 (Bankr.E.D.Pa.1987) (discounting the value of nonestate collateral when its recovery would be problematic). Finally, the value of all of the collateral not only far exceeds the debt owed to this secured creditor and all senior liens, but the creditor seeking relief receives the monthly postpetition payment of the rents from the debtors' properties.

With those facts, one could reach the conclusion that in such instances there is "equity" under section 362(d)(2)(A) in one of two ways. First, one could consider the value of nonestate property when computing the value of the collateral. *See In re Cardell.* Or, in calculating the liens against the estate property, one could apportion the liens among the various properties to reflect the existence of this other collateral. The effect is the same.[14] *See In re Miller*, 55 B.R. 49 (Bankr.D.D.C.1985) (even though the debtor held only a one-third interest in the collateral (his mother owned the remaining two-thirds), the court undertook its section 362(d)(2) analysis by considering the value of the entire property; thus, it considered the value of nonestate property).

Here, all five properties have a value of $6.8 million and all liens total $5.9 million. Consideration of the nonestate property values, or alternatively, apportionment of the lien claims among the various properties, would both yield the result of net equity.

But even if I were to focus solely upon the estate of Kirsch Enterprises and consider the liens in total, so that there would be no equity within the meaning of subsection 362(d)(2), the same result—a refusal to terminate the stay—should follow here. On these facts there is a likelihood that the properties could be sold in a liquidating plan of reorganization.

I agree with the RTC that the debtor has not met its burden of demonstrating that a reorganization plan through refinancing of the properties is likely to occur in the foreseeable future. The current state of the lending market is not favorable to borrowers, Mr. Kirsch has previously unsuccessfully attempted to refinance, and the current high loan to value ratio requested by many lenders are all factors which make refinancing problematic in this instance. However, a proposal by Kirsch to sell all five properties (including the Lancaster property) is sufficiently feasible that at this early point in the bankruptcy cases of these debtors, the provisions of section 362(d)(2)(B) are established.

■ Alternatively, if the RTC has demonstrated both prongs of section 362(d)(2), I am left with the strong belief that the totality of the circumstances in this motion to lift the stay do not warrant permitting the RTC to resume foreclosure at present. Since it is receiving the net rentals and runs little risk of nonrecovery from the liquidation of its collateral, it is more appropriate to condition rather than lift the stay. That is, I conclude that deadlines for debtor Kirsch Enterprises' proposal of plan of reorganization are more appropriate than foreclosure of the Kirsch Enterprises, Inc. realty.

IV.

The corporate debtors' motions to obtain receipt of future postpetition rents is made complicated by the question of ownership

---

**14.** The RTC analysis considers the entire amount of its lien and the UVB lien in its equity analysis of the Kirsch Enterprises properties. But one could consider only a portion of the two lien amounts in the equity calculation.

For example, suppose a secured creditor is owed $1,000.00 and has a mortgage on two properties, one owned by a debtor and the other owned by a nondebtor. And if the estate property was worth $600.00 and the nonestate property worth twice as much—$1,200.00—one could apportion the lien claim into thirds for purposes of section 362(d)(2)(A). One third of the claim—$334.00—would be applied to the estate property; the remaining two-thirds would be applicable to the nonestate property.

Such an apportionment results in the existence of "equity" without considering the value of the nonestate property.

of the Colonial shopping center. The RTC maintains that Mr. Kirsch or the Montgomery County Industrial Development Authority, rather than Colonial Center, Inc., are the only parties aside from the mortgagee with a colorable claim to the rents. Thus, it challenges that debtor's assertion that the rents are "cash collateral" of the debtor, which may be utilized by a showing of adequate protection under 11 U.S.C. § 363(e).

■ If an entity has no right to receive rents under relevant nonbankruptcy law in the absence of any claims by secured creditors, the RTC is correct that a bankruptcy filing would not permit that debtor to receive rents. It is axiomatic that the scope of a debtor's interest in property is defined by relevant nonbankruptcy law and not expanded by the bankruptcy filing. *See generally, e.g., Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Nejberger,* 934 F.2d 1300, 1302 (3d Cir.1991).

However, the issue of ownership does not apply to Kirsch Enterprises, Inc. Accordingly, whether Colonial Center has any nonbankruptcy law right to receive rents from the shopping center tenants, the question of adequate protection must be addressed here as to Kirsch Enterprises, Inc.

■ Generally, when a secured creditor has possession of collateral in which the debtor retains an interest at the time of its bankruptcy filing, the debtor can obtain a turnover of that collateral so long as the security interest of the creditor will be protected after it relinquishes possession. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); *In re Contractors Equipment Supply Co.,* 861 F.2d 241, 245 (9th Cir. 1988) (prepetition garnishment of account debtor of the chapter 11 debtor was properly dissolved only upon showing that the garnishor was adequately protected); *In re Richardson,* 135 B.R. 256 (Bankr.E.D.Tex. 1992); *In re Loof,* 41 B.R. 855 (Bankr. E.D.Pa.1984); *In re Attinello,* 38 B.R. 609 (Bankr.E.D.Pa.1984).

■ The Bankruptcy Code makes this principle applicable whenever a chapter 11 debtor seeks to use "cash collateral", as defined by section 363(a). Pursuant to sections 363(c) and (e), a debtor in possession may not use cash collateral, without the consent of the secured creditor, unless the bankruptcy court so approves; and the court cannot approve such use unless the interest of that creditor would be adequately protected. *See generally In re Philadelphia Consumer Discount Co.,* 37 B.R. 946 (E.D.Pa.1984). On the issue of adequate protection, the debtor has the burden of proof. 11 U.S.C. § 363(*o*). *See In re Diaconx Corp.,* 69 B.R. at 338. In considering this issue, the debtor's prior conduct may be relevant. *See In re TM Carlton House Partners, Ltd.,* 91 B.R. 349, 357 (Bankr.E.D.Pa.1988).

■ The debtors concede that the postbankruptcy rents from the realty fall squarely within the statutory definition of cash collateral. They argue, however, that the equity cushion available to the RTC provides it with the requisite protection were the debtors to obtain future rents. While I appreciate the general protection offered by an equity cushion, the facts in this instance suggest that adequate protection for the debtors' use of the rental income is not present.

The testimony of Mr. Kirsch is that there are and have been significant net rentals available from the debtors' properties: gross income far exceeds operating expenses. Yet, these proceeds are not accounted for by him, even though it is clear that they were not used to pay the RTC's first mortgage on 146 Montgomery Avenue or its second mortgage on 207–215 Bala Avenue. (The first mortgage on this latter property is relatively small.) Therefore, it could jeopardize the RTC's interest in net rentals to allow Mr. Kirsch to collect them.

Furthermore, the only viable proposal that the debtors have suggested for reorganizing is for the real estate to be liquidated. The debtors do not need to receive the rents to do this. They have no employees to pay. The mortgagee in possession has a duty to account for rentals collected,

and to maintain the realty in a reasonable manner. Thus, the issue regarding rent collection in this dispute becomes one of the identity of management: the mortgagee or Mr. Kirsch. To order that future postbankruptcy rents be received by the debtors, I would be implicitly placing Mr. Kirsch in charge of operating these debtors. Based upon the evidence presented, this would be unfair to the debtors' creditors such as the RTC.

On the facts presented, and given the debtors' burden, I conclude that the estate and the RTC's secured interest would be adequately protected with the mortgagee's management. Thus, without addressing the ownership question of the Colonial shopping center, the debtors' motions for use of cash collateral will be denied.

An appropriate order shall be entered.